[Cite as *In re T.K.M.*, 2019-Ohio-5076.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| IN RE: T.K.M. | : | APPEAL NO. C-190020 |
| | | TRIAL NO. F15-2118x |
| | : | |
| | : | *O P I N I O N.* |

Appeal From: Hamilton County Juvenile Court

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: December 11, 2019

*Charles H. Bartlett, Jr.*, for Appellant Father,

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *R. Michael Waddle*, Assistant Prosecuting Attorney, for Appellee Hamilton County Department of Job and Family Services,

*Raymond T. Faller*, Hamilton County Public Defender, and *Elizabeth Stringer*, Assistant Public Defender, Guardian ad Litem for T.K.M.

**MOCK, Presiding Judge.**

{¶1}    Appellant father appeals the decision of the Hamilton County Juvenile Court granting custody of his daughter T.K.M. to J.C., the child's step-aunt. We find no merit in his sole assignment of error, and we affirm the juvenile court's judgment.

*Factual Background*

{¶2}    The record shows that father became involved with the child's mother and mother became pregnant while father was separated from his wife and living in Cincinnati.   Before the child's birth, father moved from Cincinnati to Seattle, Washington, to reconcile with his wife.

{¶3}    T.K.M. was born in June 2014.  Mother had a history of substance abuse, and both mother and child tested positive for methadone.  T.K.M. spent 27 days in in the neonatal intensive care unit receiving treatment.  Nevertheless, T.K.M. remained in her mother's custody for the first year of her life.  During that year, T.K.M. spent significant time at the home of father's mother, the child's paternal grandmother, who was helping mother.  Father had little contact with the child during that time.

{¶4}    In August 2015, mother gave birth to another child, who tested positive for opiates, which prompted the Hamilton County Department of Job and Family Services ("HCJFS") to file a complaint alleging that T.K.M. was dependent, neglected, and abused, and a motion for interim custody.  She was placed in grandmother's home.

{¶5}    Father appeared at a pretrial hearing on November 13, 2015.  He stipulated that he was T.K.M.'s father and that he financially supported the child. Subsequently, grandmother filed a petition for custody of T.K.M., which stated that father "lives in Seattle, WA and wants baby to have contact with mother and has

asked * * * his mother[,] [the child's] grandmother[,] to take custody and keep them in contact." A case plan filed on January 19, 2016, stated that father was aware of T.K.M.'s living situation, and that he was "not interested in caring for" T.K.M.

{¶6} On February 25, 2016, T.K.M. was found to be dependent and abused. The juvenile court granted temporary custody to HCJFS and continued placement with grandmother. The case plan's goal at that time was reunification with mother, who was required to maintain sobriety and complete drug treatment.

{¶7} T.K.M. lived in grandmother's home from September 4, 2015, until February of 2017, when she was about two and one-half years old. During that time, father visited the child several times and talked with her by phone. T.K.M. bonded with father's older daughter, who also lived with grandmother.

{¶8} During that time, grandmother reported significant concerns regarding T.K.M.'s adjustment. She stated that T.K.M. did not sleep and would frequently be up all night and that she was aggressive toward her half-sister who also lived with grandmother for a time. Grandmother further reported that the child suffered from eating disorders to a degree that grandmother had sought treatment for her from the feeding team at Children's Hospital Medical Center.

{¶9} During a home study of grandmother's home, HCJFS discovered a substantiated allegation of sexual abuse against grandmother's husband, which had not been revealed in previous background checks. When caseworkers confronted grandmother's husband, he admitted to sexually abusing his former stepdaughter and to still having the same types of urges.

{¶10} T.K.M.'s guardian ad litem filed a motion to terminate temporary custody to HCJFS and to award custody to J.C. Additionally, HCJFS filed a case plan proposing that T.K.M. and her half-sister be removed from grandmother's home and

placed with J.C. and her husband. J.C. is mother's stepsister and T.K.M.'s step-aunt, and she already had a significant relationship with T.K.M.'s older half-sister.

{¶11} Grandmother had had no knowledge of the sexual-abuse allegations against her husband, and moved out of their home and into her daughter's home. While grandmother intended to remain in her daughter's home, she had no plans to file for separation or divorce from her husband. HCJFS remained concerned that T.K.M. was still at risk to be exposed to grandmother's husband and that grandmother could not "give her the permanency she needs."

{¶12} On October 17, 2016, the magistrate issued a decision placing T.K.M. in the care of J.C. and granting custody to J.C. J.C. had already been granted custody of T.K.M.'s older half-sister. Although mother and grandmother filed objections to the magistrate's decision, father did not. The juvenile court affirmed the magistrate's decision regarding placement in J.C.'s home, but vacated the award of custody because the parties had only agreed to address the issue of placement at the hearing. The court set the case for trial on the motion to terminate HCJFS's temporary custody and award custody to J.C.

{¶13} T.K.M. adjusted quickly to J.C.'s home. A caseworker observed that after about a week in J.C.'s home, T.K.M. was "a different child." She talked much more than she had previously, and she was running around the home, laughing and playing. J.C. saw no evidence of the eating and sleeping problems or of the aggressive behavior grandmother had reported. T.K.M. quickly became attached to J.C., and she developed a strong bond with her half-sister.

{¶14} Eventually, mother supported J.C.'s petition for custody. Mother was not in a position to have custody of T.K.M., but she visited her regularly. Although J.C. lived four hours away, mother was still able to visit twice a month. T.K.M. was always excited to see her mother.

4

{¶15} After T.K.M. was placed with J.C, father filed a motion for custody. Because he lived in Seattle, he was not able to visit T.K.M. often. He visited her twice after she was placed with J.C. Those visits coincided with court hearings in Cincinnati. At both visits, T.K.M. was nervous when she first saw him, and clung to J.C. But she eventually warmed up to father, and both visits lasted several hours. J.C. stated that she was willing to allow father to visit whenever he comes to Ohio and to allow the child to travel to see him once she is old enough. Father had limited telephone contact with the child while she lived with J.C. even though J.C. had not restricted his ability to call.

{¶16} Because father lived in Seattle, HCJFS requested an interstate home study from the state of Washington, which declined to approve him as a legal custodian for T.K.M. The report stated that father had "no relationship or a minimal relationship with his daughter" and had admitted to not having a relationship with her. The report also expressed concern that father and his wife had not "therapeutically explored the circumstances" of the child's birth, which was the result of father having a relationship with the child's mother while being married. Finally, the report indicated that a home study would not be approved unless (1) father established a relationship with the child and participated in a parenting assessment and (2) father and his wife participated in therapy to address their feelings toward the child and how those feelings would impact their relationship and their ability to raise the child.

{¶17} Father disputed that he had had limited contact with the child. He and his wife both had stable employment. They lived in an apartment that was suitable for T.K.M., although they planned to move to a larger condominium if father was granted custody of T.K.M. Additionally, father's adult son and daughter lived with him or nearby.

{¶18} Although at the time of the custody hearing father's adult children lived in Seattle, they had spent a substantial amount of their childhoods living with grandmother. Grandmother still had a pending petition for custody of T.K.M. She remained married to her husband. Although she claimed to have been separated from him, the evidence showed that after T.K.M. was placed with J.C., grandmother moved back in with her husband, and they lived together in a home that they both had purchased.

{¶19} After hearing the evidence, the magistrate recommended that legal custody of T.K.M. be awarded to J.C. He also recommended that father's and grandmother's petitions for custody be denied. Father objected to the magistrate's decision. The juvenile court overruled his objections and adopted the magistrate's decision. This appeal followed.

{¶20} In his sole assignment of error, appellant father contends that the juvenile court erred in failing to award custody of his daughter to him, instead awarding custody to a nonrelative. He argues that as a parent, he has the paramount right to raise his daughter, and that the court had to determine he was unfit before it could deny his petition for custody. This assignment of error is not well taken.

### *No Finding of Unsuitability was Required*

{¶21} Father relies on *In re Hockstock*, 98 Ohio St.3d 238, 2002-Ohio-7208, 781 N.E.2d 971, and *In re Perales*, 52 Ohio St.2d 89, 369 N.E.2d 1047 (1977), for the proposition that because parents have a fundamental interest in the care, custody and management of their children, a finding of parental unsuitability is a necessary first step in child-custody proceedings between a natural parent and a nonparent. But both of those cases involved private custody disputes, as opposed to cases

involving an abused, neglected, or dependent child. *See In re C.R.*, 108 Ohio St.3d 369, 2006-Ohio-1191, 843 N.E.2d 1188, ¶ 18-19.

{¶22} When a child has been adjudicated abused, neglected, or dependent, the juvenile court has a number of dispositional alternatives available to it, including granting legal custody to a relative or any other person who has filed a petition for legal custody. R.C. 2151.353(A); *In re A.W.*, 1st Dist. Hamilton No. C-140142, 2015-Ohio-489, ¶ 8. The Ohio Supreme Court has held that when a juvenile court adjudicates a child abused, neglected or dependent, it has no duty to make a separate finding at the dispositional hearing that a noncustodial parent is unsuitable before awarding legal custody to a nonparent. *See In re C.R.* at paragraph three of the syllabus; *In re A.C.*, 1st Dist. Hamilton No. C-140273, 2015-Ohio-153, ¶ 9.

{¶23} The court noted that no statute requires a finding of parental unfitness as a prerequisite to an award of legal custody in cases where a child is adjudged abused, neglected or dependent. *In re C.R.* at ¶ 20, citing *In re Cunningham*, 59 Ohio St.2d 100, 103, 391 N.E.2d 1034 (1979). That determination does not violate the parents' fundamental interests because an award of legal custody does not divest the parents of their residual parental rights, privileges, and responsibilities. *In re C.R.* at ¶ 17.

{¶24} Father contends that only mother was found to be unsuitable and there was no determination that he was unsuitable. The Ohio Supreme Court has rejected father's argument stating, "A juvenile court adjudication of abuse, neglect, or dependency is a determination about the care and condition of a child and implicitly involves a determination of unsuitability of the child's custodial and/or noncustodial parents." *In re C.R.* at paragraph two of the syllabus. The status of the child is the focus, not the fitness of the parents. Additionally, this court has stated that when a parent files a petition for custody, which is in reality a motion to modify

a prior order of custody granted at a dispositional hearing, there is no requirement that the juvenile court first determine that the parent was unfit, as the court has already determined that the child is abused, dependent, or neglected. *In re Allah*, 1st Dist. Hamilton No. C-040239, 2005-Ohio-1182, ¶ 8.

{¶25} Father never objected to the court's initial determination that T.K.M. was dependent and abused. Further, an adjudication by a juvenile court that a child is dependent, neglected or abused followed by a dispositional order awarding temporary custody to a public children services agency is a final order and is appealable to the court of appeals. *In re Murray*, 52 Ohio St.3d 155, 556 N.E.2d 1169 (1990), syllabus; *Allah* at ¶ 3. Once the time for the filing of an appeal had passed, the issue was res judicata and father could not challenge the court's finding that the child was dependent and abused. *See In re H.F.*, 120 Ohio St.3d 499, 2008-Ohio-6810, 900 N.E.2d 607, ¶ 15-17; *In re J.D.*, 2d Dist. Montgomery No. 26588, 2015-Ohio-4114, ¶ 66; *In re Harris*, 1st Dist. Hamilton No. C-020512, 2003-Ohio-672, ¶ 7-12.

{¶26} Further, father never objected to the court's initial decision to place the child with J.C. Therefore, he forfeited all but plain error. *See In re W.W.*, 1st Dist. Hamilton Nos. C-110363 and C-110402, 2011-Ohio-4912, ¶ 37; *In re Jones*, 1st Dist. Hamilton Nos. C-090497, C-090498 and C-090499, 2010-Ohio-3994, ¶ 32-33. He had not yet filed his petition for custody, and he had no standing to assert grandmother's interest. *See In re K.C.*, 2017-Ohio-8383, 99 N.E.3d 1061, ¶ 6-13 (1st Dist.); *In re T.W.*, 1st Dist. Hamilton No. C-130080, 2013-Ohio-1754, ¶ 3-9.

{¶27} The fact of the matter is that father did not want custody after the adjudication. The guardian ad litem specifically told him early in the proceedings that he could file for custody and he declined to do so. He was content to let grandmother raise the child. It was only after the child was removed from

grandmother's home and placed with mother's stepsister and her husband that father filed his own motion. At that time, it was too late to contest the court's determination that T.K.M. was an abused and dependent child. The court was then required to determine what disposition was in the child's best interest.

### *Best Interest of the Child*

{¶28} When deciding the disposition of an abused, neglected, or dependent child, the court should base its determination on the best interest of the child. *In re A.W.,* 1st Dist. Hamilton No. C-140142, 2015-Ohio-489, at ¶ 8; *In re A.C.,* 1st Dist. Hamilton No. C-140273, 2015-Ohio-153, at ¶ 5. The statutory scheme provides no specific set of criteria when determining the best interest of the child in a legal-custody proceeding. But this court has held that the factors set forth in R.C. 2151.414(D) and 3109.04(F) are instructive. *See In re F.B.D.,* 1st Dist. Hamilton No. C-180356, 2019-Ohio-2562, ¶ 12; *In re M., R., & H. Children*, 1st Dist. Hamilton No. C-170008, 2017-Ohio-1431, ¶ 31; *In re A.W.* at ¶ 8.

{¶29} The juvenile court has discretion to determine what placement is in the child's best interest, and an appellate court will not reverse that decision absent an abuse of discretion. *In re M., R., & H. Children* at ¶ 30; *In re A.W.* at ¶ 10. An abuse of discretion exists if the court's decision is not supported by competent, credible evidence. *In re M., R., & H. Children* at ¶ 30; *In re A.W.* at ¶ 10.

{¶30} The evidence showed that the child thrived in J.C.'s home in a way that she had not while in grandmother's home. She bonded with J.C. and her husband, their biological children, and her half-sister, who was already in J.C.'s custody and who was also thriving. Though mother could not have custody, she was able to visit regularly and had established a positive relationship with the child. J.C. also testified

that she would continue to foster a relationship between father and the child if she were granted legal custody.

{¶31} Father had no contact with the child during the first year of her life. After that, he had only intermittent contact with the child, even when she lived with grandmother. Even after the child was placed with J.C., he only called the child sporadically, four or five times between the placement and the custody hearings. He only visited the child twice, and he had no real bond with her. He claimed to have spent substantial amounts of time with the child when she lived with grandmother, but the juvenile court did not find that testimony to be credible. Matters as to the credibility of evidence were for the trier of fact to decide. *Davis v. Flickinger*, 77 Ohio St.3d 415, 419, 674 N.E.2d 1159 (1997); *In re Z.H.*, 1st Dist. Hamilton Nos. C-150305 and C-150301, 2015-Ohio-3209, ¶ 10.

{¶32} Competent, credible evidence supported the juvenile court's decision to grant custody to J.C. Consequently, we cannot reverse that decision as being an abuse of discretion. *In re M., R., & H. Children*, 1st Dist. Hamilton No. C-170008, 2017-Ohio-1431, at ¶ 30.

### *ICPC Precludes Placement with Father*

{¶33} Additionally, the Interstate Compact for the Placement of Children ("ICPC"), as adopted by R.C. 5103.20, precludes placement with father. Under Article VI, Section B, when an Ohio agency requests that another state, the receiving state, perform a local assessment or home study, and the receiving state does not approve the placement, "the child shall not be placed." There is no right to judicial review in Ohio, the sending state. *In the Matter of B.L.*, 2018-Ohio-547, 105 N.E.3d 379, ¶ 21 (12th Dist.). But any "interested party" has a right to seek judicial review

through procedures in the receiving state. ICPC, Article VI, Section C; *In re B.L.* at ¶ 21.

{¶34} The state of Washington did not approve the placement primarily because of father's lack of a relationship with his daughter. Father argued below that Washington's determination was based only on the word of caseworkers from HCJFS. But he never appealed the denial in the state of Washington, and the Ohio court had no jurisdiction to review it.

{¶35} Father also relied on an exception set forth in ICPC, Article III, Section (B)(4), which states that the "provisions of this compact shall not apply to * * * [t]he placement of a child with a non-custodial parent" provided that (1) the noncustodial parent proves to the satisfaction of a court in the sending state a substantial relationship with the child; (2) the court in the sending state makes a written finding that placement with the noncustodial parent in in the best interests of the child; and (3) the court in the sending state dismisses its jurisdiction in the child's case.

{¶36} None of these conditions apply in this case. Father specifically admitted that he did not have a substantial relationship with the child. The court did not find it was in the child's best interest to place the child with father, and it did not dismiss jurisdiction. Consequently, the juvenile court was precluded from placing the child with father. We, therefore, overrule father's assignment of error and affirm the juvenile court's judgment.

Judgment affirmed.

**MYERS** and **BERGERON, JJ.,** concur.

Please note:

The court has recorded its own entry this date.