[Cite as *In re F.B.*, 2020-Ohio-5610.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

IN RE: F.B., S.B., and H.B.          :          APPEAL NO. C-200320
                                                         TRIAL NO. F11-582X

                                             :

                                             :          *O P I N I O N.*


Appeal From: Hamilton County Juvenile Court

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: December 9, 2020


*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Patsy Bradbury,* Assistant Prosecuting Attorney, for Appellee Hamilton County Department of Job and Family Services,

*Kathleen Kenney*, for Appellee Guardian ad Litem for S.B. and H.B.,

*Ed Clore*, *In re Williams* Attorney for F.B.,

*James A. Anzelmo*, for Appellant Father.

**ZAYAS, Judge.**

{¶1}   Appellant A.B. ("Father") appeals from a judgment of the Hamilton County Juvenile Court that terminated his parental rights and placed his three children, F.B., S.B. and H.B., in the permanent custody of the Hamilton County Department of Job and Family Services ("HCJFS").  For the following reasons, we affirm.

## Facts and Procedural History

{¶2}   F.B. (born on October 10, 2007), S.B. (born on December 1, 2008), and H.B. (born on October 6, 2009) are the children of Father and D.B. ("Mother"), who died from a terminal illness in February 2017.  At the time of Mother's death, Father and Mother were separated and living apart.  The children were living exclusively with Mother in Cincinnati, Ohio, while Father was living in Michigan.

{¶3}   Prior to Mother's death, the children had been on an HCJFS safety plan for several weeks due to the condition of their home, the children's hygiene, and the effects of Mother's medication for her terminal illness.  On January 31, 2017, the children were removed from her care by HCJFS for a violation of this safety plan.  Specifically, the children were not to be in contact with their uncle, Vincent Hillman, as Hillman had abused F.B. through "excessive physical discipline."  However, HCJFS learned that Hillman was driving Mother and the children in his van when he fell asleep at the wheel and crashed into a bus.  All three children were hospitalized as a result of this accident.

{¶4}   Upon Mother's passing, Father traveled to Cincinnati from Michigan to attend the funeral service on February 17, 2017, but returned to Michigan afterwards.  At that time, Father had not seen his children since October 2016. While in Cincinnati, Father asked HCJFS about completing a home study through the

Interstate Compact on the Placement of Children ("ICPC") to move the children to Michigan and stayed in contact with an HCJFS caseworker named Stafford. For unknown reasons, an ICPC was never completed. Stafford had left the agency.

{¶5} The children were adjudicated dependent on May 25, 2017, and thereafter separated into different foster placements. All three children were diagnosed with mental-health disorders. F.B. was diagnosed with PTSD and has required multiple hospitalizations due to "outbursts." She once expressed desires to kill her foster mom and herself. S.B. was diagnosed with PTSD and has deficiencies related to a traumatic brain injury that he suffered in the car accident. He has an IEP for cognitive delays and behavioral issues. H.B. was diagnosed with PTSD and enuresis. All three children are engaged in therapeutic services through HCJFS.

{¶6} On June 5, 2018, HCJFS moved to modify temporary custody to permanent custody pursuant to R.C. 2151.413(A). Father first appeared in court on October 24, 2018, for the hearing on HCJFS's motion. At that time, the court ordered visitation for Father, and also ordered him to complete services through the agency, including a diagnostic assessment, to maintain consistent and positive visitation, and to find stable income and housing.

{¶7} A trial on HCJFS's motion for permanent custody was scheduled for May 20, 2019, but was continued because Father requested new counsel. Father's counsel, who was initially appointed in September 2017, was permitted to withdraw. The trial was rescheduled to August 2019. Father's newly-appointed counsel requested a continuance of the trial, and it was rescheduled to November 2019.

{¶8} At the start of trial on November 19, 2019, Father again requested new counsel, citing communication problems with his current counsel. Father's counsel indicated that Father mailed him a copy of a lease for a new apartment but he did not

3

receive it. Father's counsel said that he and Father were "having problems communicating," and that he "may not be able to effectively represent him due to [communication problems]." The magistrate denied Father's request for new counsel.

{¶9} A trial took place over two days, on November 19, 2019, and January 28, 2020. On February 7, 2020, the magistrate granted HCJFS's motion for permanent custody of F.B., S.B. and H.B. and denied Father's motion for custody. Father filed a one-paragraph objection to the magistrate's decision, alleging insufficient proof to support the grant of permanent custody to HCJFS. In lieu of oral arguments on the objection, the trial court considered written arguments filed by the parties, in addition to the transcripts and evidence made part of the record. On August 5, 2020, the trial court adopted the findings of the magistrate and wrote its own lengthy decision. The trial court denied Father's objection and approved the magistrate's decision.

{¶10} Father now appeals, asserting two assignments of error.

**Analysis**

{¶11} In his first assignment of error, Father argues that the trial court erred in denying his motion to discharge his second court-appointed attorney.

{¶12} Appellate review of the trial court's decision as to the replacement of counsel is normally for an abuse of discretion. *See State v. Ketterer*, 111 Ohio St.3d 70, 2006-Ohio-5283, 855 N.E.2d 48 (2006). However, Father did not object to the magistrate's denial of his request for new counsel in accordance with the Ohio Rules of Juvenile Procedure. "An objection to a magistrate's decision shall be specific and state with particularity all grounds for the objection." Juv.R. 40(D)(3)(b)(ii). Because Father failed to raise this issue in his objection, he has waived all but plain

4

error. *See In re Jones*, 1st Dist. Hamilton Nos. C-090497, C-090498 and C-090499, 2010-Ohio-3994, ¶ 31-33; *In re J.G.S.*, 1st Dist. Hamilton No. C-180611, 2019-Ohio-802, ¶ 23. Plain error "is not favored and may be applied only in the extremely rare case involving exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself." *State v. Morgan*, 153 Ohio St.3d 196, 2017-Ohio-7565, 103 N.E.3d 784, quoting *Goldfuss v. Davidson*, 79 Ohio St.3d 116, 679 N.E.2d 1099 (1997).

{¶13} On the record below, Father cannot establish error, much less plain error, in the trial court's decision not to permit new counsel. "To discharge a court-appointed attorney, the defendant must show a breakdown in the attorney-client relationship of such magnitude as to jeopardize the defendant's right to effective assistance of counsel." *State v. Coleman*, 37 Ohio St.3d 286, 525 N.E.2d 792 (1988), paragraph four of the syllabus. In this case, Father was represented by counsel for the entirety of the permanent-custody trial, and counsel was actively involved in representing his interests on cross-examination and direct examination. That is, Father's counsel appears to have been fully prepared. There was no evidence presented below to demonstrate a breakdown in the attorney-client relationship such that it jeopardized Father's right to effective counsel. Moreover, Father does not argue, nor is it evident, how different counsel might have produced a different outcome. Accordingly, we overrule Father's first assignment of error.

{¶14} In his second assignment of error, Father argues that HCJFS failed to establish by clear and convincing evidence that it should be granted permanent custody of Father's children. Father contends that the trial court's determination

5

that he is not bonded with his children and that H.B. and S.B. had indicated a desire not to be placed with him is not supported by the record.

{¶15} "Because parents have a paramount right to the custody of their children, the juvenile court's determination to grant permanent custody to HCJFS must be supported by 'clear and convincing' evidence." *In re X.M.W.*, 1st Dist. Hamilton No. C-190568, 2020-Ohio-449, ¶ 7, citing *In re A.M.Z.*, 1st Dist. Hamilton Nos. C-190292, C-190317 and C-190326, 2019-Ohio-3499, ¶ 5. Clear and convincing evidence is sufficient evidence to " 'produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established.' " *In re L.D.*, 1st Dist. Hamilton No. C-190470, 2019-Ohio-4990, ¶ 4, quoting *In re W.W.*, 1st Dist. Hamilton Nos. C-110363 and C-110402, 2011-Ohio-4912, ¶ 46.

{¶16} "Although the termination of the rights of a natural parent should be an alternative of 'last resort,' such an extreme disposition is nevertheless expressly sanctioned [under R.C. 2151.353] when it is necessary for the 'welfare' of the child." *In re Cunningham*, 59 Ohio St.2d 100, 105, 391 N.E.2d 1034 (1979), quoting *In re Fassinger*, 42 Ohio St.2d 505, 330 N.E.2d 431 (1975). Pursuant to R.C. 2151.353(A)(2), when a child has been previously adjudicated dependent and temporary custody has been granted to HCJFS, the agency may move for permanent custody of the child under R.C. 2151.413(A) and 2151.414. The juvenile court will then grant permanent custody to the agency if a two-prong test is satisfied. *See* R.C. 2151.414(B). Under R.C. 2151.414(B)(1), clear and convincing evidence must demonstrate that (1) the grant of permanent custody is in the child's best interest and (2) one of the factors under R.C. 2151.414(B)(1)(a) through (e) is also met. *See* R.C. 2151.414 (B)(1) and (D)(1); *In re M.*, 1st Dist. Hamilton No. C-170008, 2017-Ohio-1431, ¶ 17.

**First Prong—R.C. 2151.414(B)**

{¶17} Under the first prong, the requisite R.C. 2151.414(B)(1)(a) through (e) finding, Father properly concedes that R.C. 2151.414(B)(1)(d) is satisfied in this case. R.C. 2151.414(B)(1)(d) involves a finding by the juvenile court that the "[t]he child has been in the temporary custody of one or more public children services agencies * * * for twelve or more months of a consecutive twenty-two month period[.]" For purposes of calculating this time, this period runs from the earlier of the date that the child was adjudicated dependent or 60 days from the date that the child was removed from the home. R.C. 2151.413(D)(1). The earlier date for all three children in this case was 60 days after the date they were removed from the home and placed in the temporary custody of HCJFS. That date was April 1, 2017. Therefore, at the time that HCJFS moved for permanent custody in June 2018, the children had been in the temporary care of the agency for 14 months of the consecutive 22-month period.

**Second Prong—R.C. 2151.414(D)(1)**

{¶18} Under the second prong, the trial court must determine whether granting permanent custody to the agency is in the best interest of the child. *See* R.C. 2151.414(B)(1). Pursuant to R.C. 2151.414(D)(1), the court may find that permanent custody is in the best interest of the child upon consideration of all relevant factors, including: (a) the child's relationships with the parents, siblings, foster caregivers, and any other person who may significantly affect the child; (b) the wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with consideration granted for the child's maturity; (c) the custodial history of the child, including whether the child has been in the custody of a public child services agency for 12 or more months in a consecutive 22-month period; (d) the child's need for a

legally secure permanent placement; and (e) whether any of the factors in R.C. 2151.414(E)(7) to (11) apply in relation to the parents and child.

{¶19} In conducting the best-interest analysis "[n]o single factor is given greater weight or heightened significance." *In re P.*, 1st Dist. Hamilton Nos. C-190309 and C-190310, 2019-Ohio-3637, ¶ 35, citing *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 57.

{¶20} The first factor, R.C. 2151.414(D)(1)(a), addresses the "interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child[.]" Father claims that the juvenile court did not fully appreciate the bond that the children shared with him in its determination.

{¶21} Father testified that before Mother had passed away, the children visited him up to three to four times a year, which included some school breaks and weekends. However, the juvenile court's determination that S.B. and H.B. "do not have a strong emotional bond with father" is supported by the record. Prior to Mother's funeral in February 2017, Father had not seen his children since October 2016. After the funeral, Father did not have contact with the children for a 20-month period. The court also recognized that S.B. and H.B. had displayed hesitation in wanting to visit Father, which is supported by the guardian ad litem's testimony, as discussed below.

{¶22} The court also noted the accounts of Father's visitation at the Family Nurturing Center:

> [Father] had to be redirected on multiple occasions. The redirection was attempted to prevent new trauma to the children. Although the children have been without a parent for years, [Father] informed the

8

children that he had adopted another child. His play with S.B. became conflictual and he held his phone in the child's face threatening to have the foster parents come and get him. The child reacted so poorly to this threat that he became angered and removed himself from the visit. [Father] became angered because the child, in his view, was controlling the visit. [Father's] basketball play with [H.B.] had to be redirected due to the risk of physical injury. At the post visit processing the visitation observer state the father smelled of alcohol, had "glossy" eyes, and kept repeating himself multiple times.

{¶23} The court recognized that F.B. had telephonic communication with Father and has expressed a desired to be placed with Father. However, the court also noted that Father provided inconsistent accounts on how often the telephone communications occurred, and Father had not consistently visited with F.B. since the end of 2018. Thus, while Father might have some bond with his children, the record contains countervailing evidence against Father's interaction and interrelationship with the children.

{¶24} The juvenile court also took into account the wishes of the children, through the position of the children's guardian ad litem ("GAL"), who supported a grant of permanent custody to HCJFS. *See* R.C. 2151.414(D)(1)(b). The GAL emphasized Father's abandonment of his children and the effect that that had on them, particularly S.B. and H.B. She explained that S.B. and H.B. displayed indifference and did not want to participate in the visits, and said that "[d]uring numerous visits, the children would appear standoffish, fearful of their safety, or become visibly upset as a result of Father's comments and behavior." The GAL noted that both children have a significant bond with their foster families, and also that

9

they have made significant progress addressing medical and cognitive issues. For example, she said that S.B. displayed more control over his emotions, while H.B. had decreased instances of bed-wetting. With regard to F.B., the GAL noted that Father testified that he had regular communication with her, but an agency caseworker testified that he was not given the necessary passcode to speak with her while she was residing at a treatment facility. F.B. indicated through her *In re Williams* attorney that she desired placement with her father.

{¶25} Considering the custodial history of the children pursuant to R.C. 2151.414(D)(1)(c), the juvenile court found that the children were in the temporary custody of HCJFS for over 12 months of a consecutive 22-month period, which as discussed above, was supported by the record. The children had spent no appreciable time living with their father in the last several years, during the time he resided in Michigan.

{¶26} R.C. 2151.414(D)(1)(d) concerns "[t]he child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to [HCJFS]." The juvenile court concluded that Father could not adequately care for the children, requiring a legally secure placement with HCJFS, primarily due to the children's need for ongoing mental-and-behavioral health services. The record supports this conclusion. For example, through the case plan Father was ordered to engage in individual therapy and he failed to do so despite admittedly struggling with mental-health issues since he was a young child. Additionally, up until the trial, Father was living in an apartment in which he could not have his children living with him.

{¶27} R.C. 2151.414(D)(1)(e) requires the court to consider whether any factor listed in R.C. 2151.414(E)(7) through (11) applies. The court found that (E)(10)

10

applies because Father had abandoned his children "prior to his involvement in the case in October 2018." *See* R.C. 2151.414(E)(10) ("The parent has abandoned the child."). Under R.C. 2151.011(C), a child must be "presumed abandoned when the parents of the child have failed to visit or maintain contact with the child for more than ninety days, regardless of whether the parents resume contact with the child after that period of ninety days." As discussed above, the record of Father's lack of contact with his children supports the trial court's finding of abandonment.

{¶28} Based on the foregoing, the record reflects that the juvenile court engaged in proper consideration of the relevant statutory factors, finding by clear and convincing evidence that the grant of permanent custody was in the children's best interest. Father's second assignment of error is overruled.

### Conclusion

{¶29} Accordingly, we affirm the judgment of the juvenile court.

Judgment affirmed.

**MYERS** and **WINKLER, JJ.,** concur.

Please note:

The court has recorded its own entry on the date of the release of this opinion.

11