[Cite as *In re R.A.D.*, 2021-Ohio-372.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| IN RE: R.A.D., R.H.D., R.C.1, R.C.2, and R.C.3. | : | APPEAL NOS. C-200325 |
| | | C-200326 |
| | : | C-200344 |
| | | C-200345 |
| | : | C-200346 |
| | | TRIAL NO. F17-1467z |
| | : | *O P I N I O N.* |

Appeals From:  Hamilton County Juvenile Court

Judgment Appealed From Is:  Affirmed

Date of Judgment Entry on Appeal:  February 10, 2021

*Phyllis Schiff*, for Appellant Mother,

*Roger W. Kirk*, for Appellant Father D.C.,

*Treleven & Klingensmith, LLC.*, and *John Treleven*, for Appellants Father T.F.1 and Petitioner T.F.2,

*Cynthia S. Daugherty*, for Appellant Petitioner L.M.,

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Nicholas C. Varney*, Assistant Prosecuting Attorney, for Appellee Hamilton County Department of Job and Family Services,

*James W. Costin*, for the Guardian Ad Litem,

*Kimberly Thomas*, *In re Williams* Attorney for R.A.D.

**ZAYAS, Presiding Judge.**

{¶1}   The Hamilton County Juvenile Court granted permanent custody of five children to the Hamilton County Department of Job and Family Services ("HCJFS") and denied custody petitions filed by various relatives.  The mother of the children, two of the fathers of the children, and two custody petitioners have appealed the juvenile court's decision.  We find no merit in their assignments of error, and we affirm the juvenile court's judgment.

### I.  Facts and Procedural History

{¶2}   Appellant mother has five children.  The oldest child is R.A.D., who was born on February 11, 2011.  Her father is appellant T.F.1.  The second-oldest child is R.H.D., who was born on October 4, 2015.  Her father is S.H.  The other three children are R.C.1, R.C.2 and R.C.3, born on January 26, 2016, January 8, 2017, and December 9, 2017, respectively.  Their father is appellant D.C.

{¶3}   The record shows that HCJFS received interim custody of the four oldest children through an ex parte emergency order on May 22, 2017.  HCJFS had alleged that the children were removed from the home due to an ongoing pattern of domestic violence between mother and D.C., which had occurred in the presence of the children.  Additionally it alleged that R.C.1 had ingested opioids at the home while in the care of D.C., and had to be revived with Narcan and hospitalized.  D.C. had fled the scene because he had outstanding warrants.  The following day, the court granted interim custody to HCJFS based on the agreement of the parties.  Subsequently, all four children were found to be neglected and dependent.  R.C.1 was also found to be abused.  The juvenile court granted temporary custody of those four children to HCJFS.

{¶4} Unbeknownst to HCJFS, mother subsequently gave birth to R.C.3. The child was released from the hospital to mother and resided with her for over a month. D.C. was the alleged father of R.C.3. When HCJFS learned of the birth of R.C.3, it removed him from mother's home. The basis for the removal was that mother had not addressed the issues that had caused the other children to be removed from the home and had not yet engaged in any services. The juvenile court granted interim custody of R.C.3 to HCJFS on January 10, 2018. He was later adjudicated dependent.

{¶5} The juvenile court approved a case plan with a goal of family reunification. The plan required mother to engage in individual counseling, to complete domestic-violence classes through Women Helping Women, to complete parenting classes, to consistently visit the children, and to submit to random drug screens. Mother was also required to obtain stable income and housing.

{¶6} None of the three fathers engaged in any services. All three were repeatedly incarcerated while the case was ongoing. T.F.1, the father of R.A.D., was incarcerated since before the case was opened on charges of felonious assault and having weapons while under a disability. He was released in February 2019, incarcerated again in August 2019, and released again by October 29, 2019. S.H. appeared early in the case and completed genetic testing to show that he was R.H.D.'s father. He was subsequently incarcerated and remained incarcerated for the remainder of the case. D.C. had a history of charges for drug-related offenses and a history of domestic violence against mother. He continued to have outstanding warrants for his arrest. Once he was arrested, he remained incarcerated for the remainder of the case.

{¶7}  Mother completed her domestic-violence classes and her parenting classes.  She acknowledged that she was frequently the victim of domestic violence at the hands of D.C.  The violence began a couple of months after the relationship started in 2015, and continued until 2018, when D.C. was incarcerated.  Mother reported that D.C. had punched her, pulled her hair, bit her face, and given her black eyes.  Mother further acknowledged that the children were present during the violent incidents and that the oldest, R.A.D., had witnessed her mother crying and screaming from the injuries inflicted on mother by D.C.  Mother had filed charges, but D.C. was never convicted because mother did not follow through on the charges.

{¶8}  Nevertheless, even after completing the classes, mother still maintained a romantic relationship with D.C., while stating to HCJFS and the children's guardian ad litem ("GAL") that she had had no contact with him.  HCJFS discovered that mother was accepting calls from him from the jail and having conversations with him.  When HCJFS confronted mother about the calls, she said that she was only discussing issues involving the children with him.

{¶9}  Mother did not submit to any drug screens.  She was convicted of marijuana possession in November 2018.  At one point, she was asked to submit to a drug screen, but she claimed that she did not have her identification to complete the screen.  She claimed that that occasion was the only time HCJFS asked her to complete a drug screen, and she denied using marijuana or any other drug.  However, in the recordings of the calls with D.C., she admitted using marijuana.

{¶10} Mother visited with her children at the Family Nurturing Center ("FNC") for two hours weekly.  The visitations remained at the highest level of supervision since their inception.  Early in the case, mother did not visit the children consistently.  She missed visits and frequently showed up late, sometimes up to 30

4

minutes late. She claimed that her lack of consistency was due to transportation problems. HCJFS provided bus tokens and gas cards to mother so she could attend the visits. Though the FNC staff never requested less restrictive visitation, HCFJS stated that there were no problems. The children were bonded with their mother and happy to see her.

{¶11} Numerous petitions for custody were filed by various relatives of the children, some of which were withdrawn or abandoned. Those relatives included: (1) T.F.2, the paternal aunt of R.A.D., (2) L.M., a cousin of S.H., who sought custody of R.H.D., and (3) C.M., mother's great aunt, who sought custody of all five children. HCJFS placed the children with various relatives. Ultimately, HCJFS removed the children from all of those placements for various reasons.

{¶12} Subsequently, all of the children were placed in foster care. R.A.D. and R.C.2 were placed together in a foster home. R.A.D. was diagnosed with "Unspecified Trauma" and "Unspecified Stress Disorder" and was receiving therapy. She is behind for her age, and has an "Individualized Education Plan." R.C.2 does not receive any special services and is doing well in the home.

{¶13} R.H.D. and R.C.1 were placed together in a foster home. The children's behavior improved, and they were more stable since being placed in the home. According to their foster mother, they were better listeners and better at following the rules. Both children were diagnosed with "Adjustment Disorder" and received therapy. R.H.D. also received speech therapy, and her speech has improved.

{¶14} R.C.3 remained in the foster home in which he was placed at the age of one month. He was not involved in any services and was doing well in the home.

{¶15} On September 4, 2018, HCJFS filed a motion to modify temporary custody of all five children to permanent custody. An attorney was appointed to represent R.A.D. pursuant to *In re Williams*, 101 Ohio St.3d 398, 2004-Ohio-1500, 805 N.E.2d 1110, because she had expressed a desire to return to her mother's custody. A magistrate denied all the remaining custody petitions and granted permanent custody to HCJFS. Mother, T.F.1, the father of R.A.D., D.C., the father of R.C.1, R.C.2 and R.C.3, and one of the custody petitioners, L.M., filed objections to the magistrate's decision. The juvenile court overruled their objections and adopted the magistrate's decision. Mother and the same two fathers have appealed the juvenile court's decision. Two of the custody petitioners, T.F.2 and L.M., have also appealed.

### II. Permanent Custody

{¶16} All of the appellants raise assignments of error contending that the trial court erred by granting permanent custody of the five children to HCJFS. They argue that permanent custody was not in the children's best interest, that the court's decision was not supported by sufficient evidence, and that it was against the manifest weight of the evidence. These assignments of error are not well taken.

{¶17} R.C. 2151.414(B) provides that a juvenile court may grant permanent custody of a child to a public children-services agency if it finds by clear and convincing evidence that (1) permanent custody is in the best interest of the child and (2) that one of the five conditions in R.C. 2151.414(B)(1)(a) through (e) applies. *In re A.F.*, 1st Dist. Hamilton Nos. C-200230 and C-200231, 2020-Ohio-5069, ¶ 20; *In re J.G.S.*, 1st Dist. Hamilton Nos. C-180611 and C-180619, 2019-Ohio-802, ¶ 34.

6

### *A. R.C. 2151.414(B)(1) Conditions*

**{¶18}** The record shows that the oldest four children had been in the custody of HCJFS for more than 12 months of a consecutive 22-month period. Therefore, clear and convincing evidence supported the trial court's finding that the condition in R.C. 2151.414(B)(1)(d) had been met. *See In re F.B.*, 1st Dist. Hamilton No. C-200320, 2020-Ohio-5610, ¶ 17; *In re A.F.* at 20.

**{¶19}** As to the youngest child, R.C.3, the 12-of-22 condition did not apply. The juvenile court found that he, as well as the other children, could not be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents under R.C. 2151.414(B)(1)(a). In making this determination the court considered that the parents had failed to remedy the conditions that caused the child to be placed outside of the home. *See* R.C. 2151.414(E)(1); *In re D.M.*, 1st Dist. Hamilton No. C-200043, 2020-Ohio-3273, ¶ 25.

**{¶20}** The primary reason for the removal of all the children from the home was the ongoing domestic violence between mother and D.C., which had occurred in front of the children. Mother had engaged in services and completed domestic-violence education. According to the caseworker, she could "regurgitate" what she had learned, but she did not apply it. She continued to engage in a romantic relationship with D.C., as evidenced by the recordings of calls from the jail, and she planned to be together with D.C. after he was released from jail. She discussed living with him and the children and even discussed getting married. She lied to HCJFS and the GAL until she was confronted with the recordings. D.C. did not engage in services at all, and on the recordings of the jail cells, he continued to threaten mother and to be abusive to her.

{¶21} Mother argues that she complied with the provisions of the case plan. However, the dispositive issue is not whether a parent has complied with the case plan, but whether the parent has substantially remedied the conditions that led to the children's removal. *In re A.F.*, 1st Dist. Hamilton Nos. C-200230 and C-200231, 2020-Ohio-5069, at ¶ 26. A parent's compliance with the case plan does not preclude a trial court from awarding custody to a children-services agency, as long as it is in the child's best interest. *Id.*; *In re J.G.S.*, 1st Dist. Hamilton No. C-180611, 2019-Ohio-802, ¶ 39.

{¶22} Clear and convincing evidence supported the juvenile court's findings that the conditions that caused the children to be removed from the home had not been remedied. Therefore, R.C.3, as well as the other children, could not or should not be placed with their parents within a reasonable time.

### B. Best-Interest Factors

{¶23} Thus, the only remaining issue is whether granting permanent custody of the children to HCJFS was in their best interest. *See In re A.F.* at ¶ 21; *In re J.G.S.* at ¶ 38. R.C. 2151.414(D)(1) provides that in determining the child's best interest, the court shall consider "all relevant factors," including (a) the child's interaction with parents, siblings, relatives, foster caregivers and out-of-home providers, and any person who could have significantly affected the child; (b) the wishes of the child, as expressed by the child or the child's guardian ad litem; (c) the custodial history of the child; (d) the child's need for legally secure placement and the type of placement that could have been achieved without a grant of permanent custody; and (e) whether any of the factors under R.C. 2151.414(E)(7) to (11) apply.

{¶24} The factors listed in R.C. 2151.414(E)(7) to (11) include whether (1) the parent had been convicted of or pleaded guilty to certain criminal offenses; (2) the

parent had repeatedly withheld medical treatment or food from the child when the parent had the means to provide the treatment and food; (3) the parent had placed the child at substantial risk of harm two or more times due to alcohol or drug abuse or had refused to participate in further treatment two or more times; (4) the parent had abandoned the child; and (5) the parent had had parental rights involuntarily terminated with respect to a sibling of the child, and the parent had failed to provide clear and convincing evidence that the parent can provide a legally secure permanent placement and adequate care for the health, welfare and safety of the child.  *In re B/K Children*, 1st Dist. Hamilton No. C-190269, 2019-Ohio-5503, ¶ 14-15.

{¶25}  No single factor is given greater weight or heightened significance.  *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 57; *In re P. & H. Children*, 1st Dist. Hamilton Nos. C-190309 and C-190310, 2019-Ohio-3637, ¶ 35. The weight to be given to the individual factors lies within the trial court's discretion. *In re M., R. & H. Children*, 1st Dist. Hamilton No. C-170008, 2017-Ohio-1431, ¶ 34. The record shows that the juvenile court considered all the relevant factors.  As long as the court considered all the factors, it need not specifically enumerate those factors in its decision.  *See In re A.F.*, 1st Dist. Hamilton Nos. C-200230 and C-200231, 2020-Ohio-5069, at ¶ 23; *In re B/K Children* at ¶ 16.

### 1. *Factors Relating to the Parents*

{¶26}  As previously discussed, the court considered the factor in R.C. 2151.414(E)(1) and determined that the parents had not substantially remedied the conditions that caused the children to be placed outside the home.  As to the fathers, the court also determined that (1) they had demonstrated a lack of commitment toward the children by failing to regularly support, visit or communicate with them when able to do so, or by other actions showing an unwillingness to provide an

adequate permanent home for the children under R.C. 2151.414(E)(4); (2) they had abandoned the children under R.C. 2151.313(E)(10); and (3) they were repeatedly incarcerated, and the repeated incarceration prevented them from providing care to the children under R.C. 2151.414(E)(13). Further, as to S.H., it found that he was incarcerated at the time of the filing of the motion for permanent custody or the dispositional hearing and would not be able to care for his child for at least 18 months under R.C. 2151.414(E)(12).

{¶27} None of the children's fathers had regularly supported, visited, or communicated with their children. The court noted that T.F.1 had regularly visited R.A.D. while she was placed in his sister's home. However, when he was told he had to engage in services to continue visiting, he made no effort to do so or to continue to visit or communicate with her. All of the fathers had been repeatedly incarcerated, and at the time of the hearings on the permanent-custody motion, S.H. and D.C. were incarcerated and had to participate by video. S.H. was scheduled to be incarcerated until December 2022. Thus, clear and convincing evidence supported the juvenile court's determination that those factors applied to the fathers.

{¶28} The court considered the factor in R.C. 2151.414(D)(1)(b), the wishes of the child, as expressed directly by the child or through the child's GAL. The court acknowledged that at that at the time of the permanent-custody hearings, R.A.D. had expressed a wish to be returned to her mother's custody. However, R.A.D.'s *In Re Williams* attorney has informed this court that she no longer wishes to be returned to her mother's custody, but instead wishes to remain in her current placement.

{¶29} The court discussed the next three factors as they related to mother, to the fathers, and to the custody petitioners. We begin by discussing those factors as they are relevant to mother and to the fathers of the children.

10

**{¶30}** The court considered the factor in R.C. 2151.414(D)(1)(a), the child's interaction and relationship with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any another person who may significantly affect the child. The court acknowledged that the children were bonded with their mother and each other. Nevertheless, it found that mother "had failed to show a protective capacity" by continuing her relationship with D.C. It also stated that the fathers had had little or no contact with the children. Competent, credible evidence supported those findings.

**{¶31}** The court next considered the factor in R.C. 2151.414(D)(1)(c), the custodial history of the child. It discussed the relative placements of the four older children. It also noted that R.C.3 had been in the same foster home since he had been one month old.

**{¶32}** Finally, the court considered the factor in R.C. 2151.414(D)(1)(d), the child's need for a legally secure, permanent placement and whether that type of placement can be achieved without a grant of permanent custody. The court concluded that based on the "complicated custodial history of the children" and their various needs, all five children need a legally secure permanent placement and that type of placement could not be achieved without a grant of permanent custody.

**{¶33}** Mother was unable to provide a legally secure placement due to her "lack of protective capacity." The fathers had abandoned the children, had been repeatedly incarcerated, and had failed to engage in services. T.F.1 argued that he had not been given the chance to engage in services, but as the juvenile court noted, "he failed to complete the most basic task asked of him, which was to simply sign a release of information to allow HCJFS to refer for services, if necessary." Clear and convincing evidence supported the juvenile court's findings.

11

### *2. Factors Relating to the Custody Petitioners*

{¶34} The last three factors are relevant to the custody petitioners and the various relative placements. The court found that the petitioners were not able to provide a legally secure placement for the children, and their actions raised concerns about their "protective capacity" for the children.

{¶35} T.F.2 is the paternal great aunt of R.A.D. She filed a petition for custody on October 3, 2018. A home study was completed and approved, and a case plan was filed approving weekend visitation on February 27, 2019. The case plan stated that T.F.2 "will not allow father to visit unless he is cleared by the agency. [T.F.2] will supervise all visitation with adults not approved by the agency." T.F.2 was given a copy of the case plan.

{¶36} The caseworker testified that he and the GAL had had multiple conversations with T.F.2 in which they told her that R.A.D.'s father should not have any type of visitation with the child until he contacted HCJFS. In fact, just prior to the start of visitation, the caseworker and the GAL went to T.F.2's house and gave her a "minimal number of instructions." Those instructions were that T.F.2 was to be present for the entire visitation and that father was not to be present during the visitation.

{¶37} Both HCJFS and the GAL had concerns about contact between R.A.D. and her father due to her father's incarceration and long absence from her life. They wanted him to be introduced to the child in a way that was emotionally healthy for her.

{¶38} After two visits, R.A.D. reported to the caseworker that during the visits she was left with her father unsupervised, and that he had even stayed the

night to care for her. When the caseworker asked R.A.D. "how everything was going and who was living in the home," she stated that she was not allowed to tell him.

{¶39} HCJFS suspended R.A.D.'s visits with T.F.2 on March 29, 2019. However, it did not amend the case plan until April 11, 2019, to reflect the suspension of visitation. The juvenile court noted that in order for HCJFS to unilaterally stop visitation prior to court authorization, the case plan should have been marked as an emergency, but it was not. T.F.1, R.A.D.'s father, filed an objection to the case plan and a request for a hearing.

{¶40} At the hearing before a magistrate, T.F.2 testified that she misunderstood the instructions. She stated that she thought that her nephew could see the child as long as he was supervised and that she would not allow him to visit if the weekend visitation were to continue. However, the evidence showed that T.F.1 was allowed to be with the child unsupervised. Further, the magistrate specifically stated, "The Court does not find it credible that [T.F.2] did not understand the minimal two instructions given her by HCJFS and the GAL." The magistrate also noted that if T.F.2 believed that the father was permitted to visit, she could have contacted HCJFS and waited for approval before allowing him to visit.

{¶41} The magistrate further stated that it was not in R.A.D.'s best interest to continue the visitation. She stated, "The GAL and HCJFS caseworker have concerns with [T.F.2's] judgment and do not trust [T.F.2], since she violated both instructions they gave to her regarding visitation." Further, the visits were supposed to last from Friday until Sunday, but on one weekend, T.F.2 acknowledged keeping the child from Friday until Tuesday without the knowledge or approval of HCFJS or the GAL. Consequently, the magistrate approved the case plan suspending the visitation.

13

{¶42} T.F.1, R.A.D.'s father, filed a motion to set aside the magistrate's decision, in which he contended that the magistrate improperly approved the case plan suspending visitation and that the case plan was not in the child's best interest. The juvenile court denied the motion, approved the case plan, and adopted the magistrate's decision.

{¶43} Later, in ruling on HCJFS's motion for permanent custody, the court relied on T.F.2's failure to follow HCJFS's instructions in determining that it was not in the child's best interest to be placed with her. Moreover, the court was deeply concerned that R.A.D. was told not to tell anyone that she had had contact with her father. It stated, "Any caregiver who instructs a child to keep secret who they are in contact with, [sic] raises serious concerns about their protective capacity." Competent, credible evidence supported the court's findings.

{¶44} R.H.D. was placed in the home of L.M., her father's cousin, where she remained for 20 days. The trial court determined that L.M. had "refused" to take R.H.D. to her therapy appointments in West Chester because she was not familiar with the area, and she did not go to places with which she was not familiar. L.M. had a car, and HCJFS repeatedly spoke to her about getting the child to her appointments. It provided her with detailed directions and gas cards. Even though HCJFS told L.M. that it would try to move the child's therapy sessions closer to her, L.M. requested that HCFJS remove the child from the home, contending that they were going to do so anyway. When a caseworker arrived at L.M.'s home, he found the three-year old child alone on the front porch with her belongings.

{¶45} L.M. argues that she provided R.H.D. with a suitable home, and that she got the child to other doctor's appointments in areas with which she was familiar. However, the juvenile court found that L.M. did not even attempt to take the child to

her therapy appointments. Further, L.M. disputed the caseworker's testimony that she left the child alone on the porch. The court did not find her testimony to be credible. Accordingly, we must find that competent, credible evidence supported the juvenile court's finding that L.M. could not provide a legally secure placement for R.H.D.

{¶46} C.M., mother's great aunt, filed a petition for custody of all five children. A home study was conducted and she was initially approved for placement of the children. The record shows that the four oldest children were placed in C.M.'s home, where they remained for several months. On December 15, 2017, R.H.D. was taken from daycare to the hospital after vomiting and exhibiting signs of a concussion. The then three-year-old child had not been properly buckled in C.M.'s van and had fallen out onto the sidewalk. Nevertheless, C.M. dropped the child off at daycare and went to work. She did not report the incident to HCJFS or the GAL.

{¶47} HCJFS removed the children from the home while they investigated the incident. They discovered that C.M.'s son, who was a drug user, was seen playing with the children unsupervised outside the home. C.M.'s brother was also permitted to be around the children unsupervised. Both C.M.'s son and brother may have been living in the home, even though they had not been approved by HCJFS. HCJFS determined that it could not trust that C.M. would safely and properly care for the children in her home.

{¶48} C.M. testified that she did not know of her son's substance abuse when the children were in her home and, once she found out, she would not allow him around the children unsupervised. She also testified that neither her son nor her brother was living with her. However, her testimony was riddled with inconsistencies. Again, the issue was credibility, and the juvenile court, which was in

15

the best position to judge credibility, did not find her testimony to be credible. Further, she stated that if she had custody of the children, she did not know if she would allow her son to be around the children, although she said that she would follow court orders. Thus, competent, credible evidence supported the juvenile court's determination that she could not provide a legally secure placement for the children.

{¶49} In sum, clear and convincing evidence supported the juvenile court's determination that granting permanent custody of all five children to HCJFS was in their best interest. Therefore, the evidence was sufficient to support the award of permanent custody. *See In re P. & H. Children*, 1st Dist. Hamilton Nos. C-190309 and C-190310, 2019-Ohio-3637, at ¶ 7; *In re A.B.*, 1st Dist. Hamilton Nos. C-150307 and C-150310, 2015-Ohio-3247, ¶ 15.

{¶50} Further, after reviewing the record, we cannot say that the juvenile court lost its way and created such a manifest miscarriage of justice that we must reverse the judgment and order a new trial. Therefore, the judgment was not against the manifest weight of the evidence. *See Eastley v. Volkmann*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 12; *In re P. & H. Children* at ¶ 7; *In re A.B.* at ¶ 16. We overrule all of the appellants' assignments of error related to the court's decision to grant permanent custody of all five children to HCJFS.

### *III. The Custody Petitions*

{¶51} Several of the appellants also present assignments of error related to the denial of the custody petitions. Under former R.C. 2151.353(A)(3), if the juvenile court finds a child to be abused, dependent or neglected, it may award legal custody to any person who has filed a petition for custody. *In re A.F.*, 1st Dist. Hamilton Nos. C-200230 and C-200231, 2020-Ohio-5069, at ¶ 35; *In re T.K.M.*, 1st Dist. Hamilton

No. C-190020, 2019-Ohio-5076, ¶ 22. When determining legal custody, the court should base its determination on the best interest of the child. *In re A.F.* at ¶ 35; *In re T.K.M* at ¶ 28.

{¶52} The statutory scheme sets forth no specific set of criteria when determining the best interest of the child in a legal-custody proceeding. However, this court has held that the factors set forth in R.C. 2151.414(D) and 3109.04(F) are instructive. *In re A.F.* at ¶ 36; *In re T.K.M.* at ¶ 28; *In re F.B.D.*, 1st Dist. Hamilton No. C-180536, 2019-Ohio-2562, ¶ 12. An appellate court must defer to the trial court's findings "regarding the weight to be given to any evidence because the trial court is in the best position to make that determination." *In re A.F.* at ¶ 35, quoting *In re M., R., & H. Children,* 1st Dist. Hamilton No. C-170008, 2017-Ohio-1431, at ¶ 34.

{¶53} The juvenile court has discretion to determine what placement is in the child's best interest, and an appellate court will not reverse that decision absent an abuse of discretion. *In re A.F.* at ¶ 37; *In re T.K.M.* at ¶ 29; *In re M., R., & H. Children* at ¶ 30. An abuse of discretion exists when the court's decision is not supported by competent, credible evidence. *In re A.F.* at ¶ 37; *In re T.K.M.* at ¶ 29; *In re F.B.D.* at ¶ 11.

{¶54} T.F.2, R.A.D's paternal great aunt, and her nephew, T.F.1, R.A.D.'s father, have appealed the juvenile court's decision denying her petition for custody, and they have filed a joint brief. In their sole assignment of error, they contend that the trial court erred in granting HCJFS's motion for permanent custody and in denying T.F.2's petition for custody of R.A.D. T.F.2 did not file objections to the magistrate's decision. Therefore, she has forfeited all but plain error*. See In re F.B.,*

1st Dist. Hamilton No. C-200320, 2020-Ohio-5610, at ¶ 12; *In re T.K.M.*, 1st Dist. Hamilton No. C-190020, 2019-Ohio-5076, at ¶ 26.

{**¶55**} T.F.1 supports his aunt's custody petition. An award of legal custody does not divest the parents of their residual parental rights and responsibilities. *In re C.R.*, 108 Ohio St.3d 369, 2006-Ohio-1191, 843 N.E.2d 1188, ¶ 21; *In re T.K.M.* at ¶ 23. Because T.F.1 has also appealed the termination of his parental rights, he has standing to raise this issue. *See In re J.A.*, 2d Dist. Clark No. 2020-CA-31, 2020-Ohio-5354, ¶ 9; *In re K.C.*, 2017-Ohio-8383, 99 N.E.3d 1061, ¶ 6-13 (1st Dist.).

{**¶56**} As we have previously discussed, T.F.2 allowed the child's father to be present in her home and to care for the child unsupervised, despite HCFJS's instructions to the contrary. Further, the child was told not to tell who was visiting her. These decisions showed T.F.2's lack of judgment and untrustworthiness, and indicated a lack of ability to protect the child. The juvenile court did not find her explanations for her conduct to be credible. Matters as to the credibility of evidence were for the trier of fact to decide. *Davis v. Flickinger*, 77 Ohio St.3d 415, 419, 674 N.E.2d 1159 (1997); *In re Z.H.*, 1st Dist. Hamilton Nos. C-150305 and C-150301, 2015-Ohio-3209, ¶ 10.

{**¶57**} Competent, credible evidence supported the juvenile court's decision that it was not in R.A.D.'s best interest to grant custody to T.F.2. Therefore, we cannot reverse that decision as being an abuse of discretion, much less say that it rose to the level of plain error.

{**¶58**} L.M. has appealed the juvenile court's decision denying her petition for custody of R.H.D. In her sole assignment of error, she contends that the juvenile court erred in denying her petition for custody and in granting HCJFS's motion for permanent custody. As previously discussed, L.M. did not even attempt to get the

child to her therapy appointments. More importantly, she called HCJFS and told them to come get the child and left the then three-year-old child alone on the front porch. Therefore, competent credible evidence supported the juvenile court's decision that it was not in the child's best interest to grant L.M.'s petition for custody.

{¶59} In her second assignment of error, mother contends that the trial court erred in granting permanent custody of her children to HCJFS because suitable less drastic alternatives were available. Mother argues that if the children cannot be returned to her, the court should have granted the custody petitions filed by T.F.2, L.M. or mother's great aunt, C.M.

{¶60} We have already rejected mother's arguments relating to T.F.2 and L.M. As to the court's failure to grant the custody petition of C.M, C.M. did not object to the magistrate's decision and has not appealed the juvenile court's decision. Nevertheless, an award of legal custody would not have divested mother of her residual parental rights and responsibilities. *See In re C.R.*, 108 Ohio St.3d 369, 2006-Ohio-1191, 843 N.E.2d 1188, at ¶ 21; *In re T.K.M.*, 1st Dist. Hamilton No. C-190020, 2019-Ohio-5076 at ¶ 23. Because mother has also appealed the termination of her parental rights, she has standing to raise this issue. *See In re J.A.*, 2d Dist. Clark No. 2020-CA-31, 2020-Ohio-5354, at ¶ 9; *In re K.C.*, 2017-Ohio-8383, 99 N.E.3d 1061, at ¶ 6-13.

{¶61} C.M. knew the child was injured and left her at daycare, only to have the child sent to the hospital with symptoms of a concussion. She did not notify HCJFS or the GAL of the injury. Further, she allowed her son, a drug user, and her brother to be around the children unsupervised. Thus, she could not be trusted to safely care for the children. Competent, credible evidence supported the juvenile

court's decision that it was not in the children's best interest to grant her petition for custody.

**{¶62}** Competent, credible evidence supported the juvenile court's decisions to deny all three custody petitions, and therefore, we will not reverse them as being an abuse of discretion. Consequently, we overrule all of the assignments of error contending that the juvenile court erred in overruling the various petitions for custody.

### IV. Summary

**{¶63}** In sum, we overrule all of the appellants' assignments of error. We affirm the juvenile court's judgment granting permanent custody of all the children to HCJFS and denying the custody petitions.

Judgment affirmed.

**MYERS** and **BERGERON, JJ.,** concur.

Please note:
    The court has recorded its own entry this date.