[Cite as *In re J.H.*, 2021-Ohio-2922.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| IN RE: J.H. and B.W. | : | APPEAL NO. C-210277 |
| | | TRIAL NO. F18-867X |
| | : | |
| | : | *O P I N I O N.* |

Appeal From:  Hamilton County Juvenile Court

Judgment Appealed From Is:  Affirmed in Part, Reversed in Part, and Cause Remanded

Date of Judgment Entry on Appeal:  August 25, 2021

*Anzelmo Law* and *James A. Anzelmo*, for Appellant Father,

*W. Edward Clore PLLC* and *W. Edward Clore*, Guardian Ad Litem for J.H and B.W.,

*Jon R. Sinclair*, for Appellee Mother,

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Nicholas C. Varney*, Assistant Prosecuting Attorney, for Appellee Hamilton County Department of Job and Family Services.

**ZAYAS, Presiding Judge.**

{¶1}    Appellant father appeals the decision of the Hamilton County Juvenile Court adjudicating J.H. and B.W. abused, neglected, and dependent, and granting permanent custody of J.H. and B.W. to the Hamilton County Department of Job and Family Services ("HCJFS").  For the reasons discussed below, we affirm the juvenile court's judgment in part, reverse the judgment in part and remand the cause for further proceedings consistent with this opinion and the law.

### Background and Procedural History

{¶2}    This case has an extensive history dating back to July 6, 2018, when the juvenile court magistrate entered an emergency ex parte order placing J.H. and B.W. in the custody of HCJFS.  HCJFS then filed a complaint for interim custody on July 9, 2018.  This complaint was subsequently amended eight times over the course of the proceedings.  Father was appointed four different public defenders due to difficulties working with appointed counsel and a guardian ad litem was also appointed to represent father's interest.

{¶3}    The trial court adjudicated J.H. and B.W. neglected and dependent on September 5, 2019; however, the original complaint was ultimately dismissed on August 5, 2020, after the juvenile court found that the time had expired to begin the dispositional phase of the hearing.  That same day, HCJFS filed a new complaint for permanent custody and a motion for interim custody of J.H. and B.W.  The juvenile court granted the motion and awarded interim custody to HCJFS.

{¶4}    On November 2, 2020, HCJFS filed a motion to dismiss the August 5, 2020 complaint since the time for the dispositional hearing had yet again expired.  HCJFS also filed a new complaint for permanent custody and motion for interim custody that same day.  On November 3, 2020, the juvenile court granted the motion

to dismiss the August 5, 2020 complaint and granted HCJFS's motion for interim custody.

{¶5} Trial on the adjudicatory phase began on January 19, 2021, and concluded on January 21, 2021. Bifurcation of the dispositional phase was waived, and the dispositional hearing was held at the conclusion of the adjudicatory hearing on January 21, 2021.

*Adjudicatory Hearing*

{¶6} The juvenile court heard testimony from father, mother, Alison Campbell–the original HCJFS assessments case worker assigned to the case–Emily Luti–a HCJFS case worker who had case responsibility starting in October of 2019–and Dr. Emily Davis, a licensed psychologist with the Court Clinic Forensic Services Center who received referrals from Family Access Integrated Recovery ("FAIR").

{¶7} Father testified that the children were primarily residing with him until the time when HCJFS became involved. He stated that he had not lived with mother since the end of 2016, but that she would still "stop by" sometimes. He testified that they had a "fairy tale" relationship and that he supported her financially and tried to tell her to do the right things. When asked about allegations of domestic violence, he responded, "There's nothing substantiated. All you have is the photograph of her two weeks after you removed the children." He referred to photographs taken at a hospital of mother "beaten up" after the children were removed and denied causing the injuries to mother in those photos. After the photos in question were shown to father, he claimed that HCJFS caused mother to get "beat up" by telling people that mother was trying to get her friend's children taken away.[1]

---

[1] The photographs were ultimately entered into evidence as state's exhibits four and five.

He denied the claim that he was keeping mother's medicine, social security card, and birth certificate from her. He asserted that mother was making up stories to get the children taken from him. He testified that, despite anything, he is going to be there for the children and be the best parent that he can be.

{¶8} Father's last visit with the children was in December of 2018. He asserted that his visits were stopped because he was told not to ask the children about "anything" and then subsequently attempted to ask the children if they were being sexually abused. He contended that he asked these questions because the children exhibited behavior that caused him to believe they were being sexually abused: J.H. allegedly covered father's mouth until it was difficult for him to breath and B.W. allegedly whispered in father's ear in a sexual manner. The children were then removed from the visitation area, and he was escorted out by a sheriff. Around five months later, father was convicted of telecommunications harassment after he got a "little too accusatory." Father asserted that he was found to be incompetent by the court clinic in the criminal case and was sent to Summit Behavioral for 38 days. He alleged, however, that he was not actually incompetent and expressed that he believed he was sent there because HCJFS wanted to silence him. He claimed that HCJFS was in a "conspiracy to commit child abuse" and alleged that he had HCJFS workers on tape saying they were allowed to sexually abuse children. He asserted that these statements were made after the children displayed signs of touching each other "on their private spots."

{¶9} Father stated that he was asked by HCJFS to complete a diagnostic assessment with FAIR. He testified that he "went there" and then also completed eight months of counseling at Talbert House. He felt the counseling was not going anywhere so he enrolled in "parenting class and stuff" in Clermont County. He was

also asked by HCJFS to do an assessment with the YWCA. He claimed that he waited for an appointment for six months but was ultimately walked out of the appointment after being told that "JFS is for women." He denied that the YWCA ever asked him to complete a lethality assessment.[2] Father testified that he was currently living in the home of a 58-year-old man that he met at a church outreach program. He denied having a lease or contract to live there. He asserted that he was receiving unemployment compensation and paid five hundred dollars a month in rent.

{¶10} Mother testified that she was 15 years old when she became involved with father and 17 years old when she became pregnant with J.H. She claimed that father was either 32 or 34 years old at the time. She asserted that she was assaulted by father many times over several years, and that the children were present during all of those altercations. She also alleged that father assaulted her several times after the children were taken from her. She testified that father caused the injuries depicted in the photographs taken of her at the hospital during the pendency of the case and, after being shown the photographs, confirmed that the photographs accurately portrayed her injuries. She denied father's assertion that her friend caused the injuries. She testified that she was living with father when the children were removed but is now living in Minnesota to get away from father.

{¶11} Alison Campbell testified that she had many personal conversations with father. This included a conversation with father about her concerns with the injuries depicted in the photographs. She alleged that father told her that someone named Rae broke into the hospital and assaulted mother; however, she confirmed that this was not true and that no one broke into the hospital. She also met with

---

[2] No testimony or evidence was presented to establish what a lethality assessment is.

mother who indicated that father was the one who had assaulted her. Mother additionally told her that father had her medication, birth certificate and social security card and refused to give any of them to her. When she talked to father, he denied any accusations of domestic violence and denied any accusations that he was controlling mother. Father also told her that he did not know mother was underage when they started dating. HCJFS was concerned with father's violence and requested that father complete a FAIR assessment and referred father to the YWCA for an assessment regarding the domestic violence. She could not recall if father completed the FAIR assessment but knew that father did not complete the YWCA assessment while she was involved in the case.

{¶12} Emily Luti testified that father did not sign a valid release of information for HCJFS until December of 2020, so she was unable to successfully verify if father completed any services or made progress in any services. She asserted the YWCA assessment was never completed. The YWCA listened to voicemails that father left for mother leading up to the scheduled appointment and felt that father was best suited for the Transform Program. She alleged that father attended the orientation for this program; however, his behavior during the orientation caused him to be removed from the YWCA. The YWCA requested that father complete an updated lethality assessment before he would be allowed to return. She asserted that father did not continue with any domestic-violence services. She talked to father about her concerns with his violence; however, father denied being violent with mother. She talked to mother about the injuries in the photographs and mother confirmed that it was father who caused the injuries.

{¶13} Luti testified that father did complete a mental-health assessment in October of 2018 and an updated assessment in December of 2020; however, father

failed to complete any assessments in the interim and failed to follow through with any of the recommended mental-health counseling. Father claimed to be in services with Cincinnati Counseling Services ("CCS"), but never provided the name of his therapist or any contact information. She did attempt to contact CCS but never received a response. Father did attend Talbert House for several months; however, when she "looked back at the notes, it had stated that there were several times where he didn't call, he didn't show up or when he got there he was so agitated that they had to reschedule." She asserted that father had not engaged in any mental-health counseling since May of 2019. She was able to visit the home where father was living and did not have any concerns with the home; however, as of the time of the hearing, she did not have any way to contact the roommate or get any fingerprints from the roommate to complete the required background check.

{¶14} Father's mental-health assessment in 2018 was completed by Dr. Emily Davis. Her evaluation report was admitted into evidence. Dr. Davis testified that notable concerns with father from the assessment were impulse control, emotional regulation, impulsive reactions to anger and stress-provoking events, externalization of blame and projection, and lack of insight into accountability for responsibility for behaviors and decision making. Her ultimate diagnoses were adjustment disorder with mixed disturbance of emotions and conduct and unspecified personality disorder. She recommended that father engage in mental-health counseling and be further evaluated.

*Dispositional Hearing*

{¶15} The juvenile court heard testimony from father, mother, Emily Luti, and Mandy Klosterman, a foster care social worker for Beech Acres Parenting Center assigned to this case.

7

{¶16} Emily Luti testified that HCJFS recommended that father engage in a diagnostic assessment, follow all recommendations from that assessment, complete an assessment with the YWCA, and follow any recommendations from that assessment. She never received any completed certificates from any service provider to show that father completed any of these services. Father did not complete the mental-health counseling as recommended during his mental-health assessment. Father was involved with Talbert House for quite some time; however, there were concerns with attendance and with having to reschedule because father was too agitated to move forward with the sessions. Thus, Luti asserted that father did not successfully complete services at Talbert House. Father never provided her with any proof that he engaged in any mental-health counseling. Father did go to FAIR on his own accord in December of 2020 to get an updated diagnostic assessment; however, his follow-up appointment was not scheduled until after the trial. Luti was not aware of any services that father completed besides the diagnostic assessments so she opined that HCJFS could not represent that father remedied any of the situations that caused the children to be removed from his care. Father did not provide a valid address to visit any home that he was residing in prior to December of 2020. Additionally, she was not able to speak with father's current roommate or obtain fingerprints from his roommate.

{¶17} She testified that the children were being taken care of in their current placement and have been in the same foster home since coming into HCJFS's care. They were well bonded to their foster parents and did not have a working memory of mother or father. The children were attending all needed services and were starting to make progress therapeutically.

{¶18} Mandy Klosterman testified that she had regular contact with the children and that they were happy and comfortable in their current placement. She claimed that she transported the children back to their foster home after the last visit with father and she felt the children appeared somewhat fearful on the way home. She reported that B.W. did not have any memories of her parents and that J.H. had just recently began talking about the traumas she witnessed when she was with her parents. She expressed that the foster placement was meeting all their needs and that there was a strong bond between the children and the foster parents. She claimed that foster father was employed in a different department of HCJFS; however, their family did not receive any special treatment and the family did not have any involvement in the ongoing case.

{¶19} A certificate of completion for the "Active Parenting Now" program was entered into evidence by father during trial; however, father had just given the certificate to his counsel on the day of trial, so no other party had seen the certificate prior to trial. Father asserted that he would ensure the children remained in counseling if they were returned to him. He also claimed that he would be willing to undergo mental-health treatment if the children were returned to him; however, he later claimed that he does not need mental-health treatment. Father testified that he is an appropriate caretaker for the children. He had a place to live that had a washer and dryer and was willing to give HCJFS his roommate's phone number. He claimed that he could prepare meals for the children and had a doctor to take them to if needed. He made the children laugh and they did all kinds of activities together. He claimed his children were "prefect angels and that's why this agency wants them."

{¶20} Mother testified that she saw pictures of the children in their current placement over the past two years and that they seem very happy and healthy. She

stated that her only request was that the children stay together and asserted that she would like the children to be adopted by their current placement.

*Trial Court Orders*

{¶21} On January 21, 2021, the juvenile court adjudicated J.H. and B.W. abused, neglected, and dependent. The juvenile court also ordered that written closing arguments be filed and continued the case for a decision on disposition. On April 26, 2021, the juvenile court granted permanent custody of J.H. and B.W. to HCJFS.

**Law and Analysis**

*First Assignment of Error*

{¶22} In his first assignment of error, father argues that the trial court erred by failing to hold a hearing on whether he was incompetent to proceed with the custody proceedings. Father concedes that this issue was not raised in the trial court and thus plain-error review applies. "Plain error 'is not favored and may be applied only in the extremely rare case involving exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself.' " *In re F.B.*, 1st Dist. Hamilton No. C-200320, 2020-Ohio-5610, ¶ 12, quoting *State v. Morgan*, 153 Ohio St.3d 196, 2017-Ohio-7565, 103 N.E.3d 784.

{¶23} Father contends that the trial court's failure to hold a competency hearing rises to the level of plain error because he likely would have been found incompetent. However, father failed to point to any legal rule, applicable in Ohio, that requires a court to hold a competency hearing when a parent's competency is in question during parental-termination proceedings. Contrary to his assertion, R.C.

10

2151.281(C) provides, "In any proceeding concerning an alleged or adjudicated delinquent, unruly, abused, neglected, or dependent child in which the parent appears to be mentally incompetent or under eighteen years of age, the court shall appoint a guardian ad litem to protect the interest of that parent." *See* Juv.R. 4(B). "The statute thus requires that a guardian *ad litem* be appointed when a parent even *appears* incompetent, without first requiring a determination that the parent is indeed incompetent." (Emphasis sic.) *In re Moore*, 12th Dist. Butler No. CA99-09-153, 2000 WL 1252028, *5 (September 5, 2000).

{¶24} "[T]he paramount interests at issue in criminal and parental rights proceedings are very different." *In re A.S.*, 8th Dist. Cuyahoga Nos. 94098 and 94104, 2010-Ohio-1441 (Rocco, P.J., concurring). "In a criminal case, if the defendant is incompetent to assist his attorney, all proceedings are stayed until the defendant is restored to competency." *Id.*, citing R.C. 2945.38. "In a parental rights case, however, the best interests of the child guide the process." *Id.*, citing *In re D.A.*, 113 Ohio St.3d 88, 2007-Ohio-1105, 862 N.E.2d 829, ¶ 11. "The parent's incompetency will not halt the process, although a guardian ad litem may be appointed to protect the incompetent parent's interest." *Id.*, citing R.C. 2151.281(C); Juv.R. 4(B).

{¶25} Thus, the law in Ohio requires that the trial court appoint a guardian ad litem to represent the parent's interest when a parent appears to be incompetent in a parental-termination proceeding. This is exactly what the juvenile court did in this case. Father was appointed a guardian ad litem, and the record shows that the guardian ad litem was present on each day of trial and participated in the cross-examination of witnesses at some points. Therefore, on the record below, father

11

cannot establish error, much less plain error, in the trial court's actions. Accordingly, this assignment of error is overruled.

*Second Assignment of Error*

{¶26} In his second assignment of error, father argues that the trial court committed per ser reversible error by denying his request to represent himself. At no point did father, father's counsel or father's guardian ad litem object to the trial court's denial of father's request to represent himself or otherwise raise the issue in the trial court. Accordingly, father has waived all but plain-error review. *Goldfuss v. Davidson*, 79 Ohio St.3d 116, 121, 679 N.E.2d 1099 (1977) ("Similarly, we have long recognized, in civil as well as criminal cases, that failure to timely advise a trial court of possible error, by objection or otherwise, results in a waiver of the issue for purposes of appeal.").

{¶27} A parent is entitled to legal representation at all stages of parental-termination proceedings. *See* R.C. 2151.352; *see also In re W.W.E.*, 2016-Ohio-4552, 67 N.E.3d 159, ¶ 31, 34 (10th Dist.). "The right of self-representation has been addressed almost exclusively in the criminal context and its expression in the United States Constitution has been traced to the structure and spirit of the Sixth Amendment." *In Matter of Bowens*, 11th Dist. Ashtabula Nos. 92-A-1711 and 92-A-1717, 1995 WL 803811, *2 (Nov. 9, 1995), citing *Faretta v. California*, 422 U.S. 806, 818, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). However, in parental-termination proceedings, due process requires "that the right to self-representation be recognized as co-extensive with the right to court-appointed counsel." *Id.* Nevertheless, as in the criminal context, the right to self-representation is not unlimited. *Id.* The waiver of the right to counsel must be done knowingly, intelligently, and voluntarily. *Id.*; *Accord In re M Children*, 1st Dist. Hamilton No. C-180564, 2019-Ohio-484, ¶ 15.

12

{¶28} Father first stated to the trial court that he wanted to represent himself during mother's testimony on the first day of trial. The request was exclaimed in the middle of the proceedings while the court was addressing the attorneys regarding any additional questions they may have for mother. The trial court did not respond to father's interruption. Father made a second request to represent himself on the second day of trial during the testimony of Alison Campbell. The trial court denied the request and told father that he was beyond the point of representing himself. Neither father, father's attorney nor his guardian ad litem objected or in any way raised any issue with the denial to the trial court. At the start of trial on the third day, the court allowed father to openly testify to the court on the record after his attorney informed the court that father wanted to address the court about father's concerns with how his attorney was handling the case. Father expressed frustration that his attorney was not asking the questions to the witnesses that father was telling him to ask and claimed that his attorney was "throwing the case on purpose." Father then expressed disagreement with statements the witnesses had made during their testimony but never reasserted any desire to represent himself.

{¶29} Father cites to *State v. Vrabel*, 99 Ohio St.3d 184, 2003-Ohio-3193, 790 N.E.2d 303, ¶ 49, for the proposition that a trial court commits per se reversible error when it denies an individual the right to self-representation and argues that the trial court committed per ser reversible error by denying father's request to represent himself. However, the court in *Vrabel* held that a trial court commits per se reversible error only where the trial court denies the right to self-representation *when properly invoked. Id.* at ¶ 50. The court goes on to note that other courts have found that "invocation of the right to self-representation can be disallowed where such a request is untimely." *Id.* The court ultimately held that the trial court in that

13

case did not abuse its discretion and properly refused the defendant's request to represent himself where the request was made after voir dire had been completed and on the first day that evidence was being presented. *Id.* at ¶ 53.

{¶30} Additionally, it has been held in the criminal context that a request is not a clear and unequivocal request for self-representation where the record shows that the outburst was the product of an emotional response brought on by an appellant's frustrations that his trial counsel was not asking the questions that the appellant wanted him to ask. *State v. Baskin*, 2019-Ohio-2071, 137 N.E.3d 613, ¶ 18 (3d Dist.). Here, father's requests were made in the course of the ongoing proceedings and were products of an emotional response brought on by his frustration that his trial counsel was not asking questions he wanted him to ask. Thus, the requests were untimely and were not clear and unequivocal requests. This conclusion is supported by the fact that father did not repeat his request to represent himself when he was specifically allowed to address the court directly regarding his frustrations.

{¶31} Furthermore, even if the request for self-representation was clear and unequivocal, we find it particularly important to note that father's guardian ad litem did not object to the trial court's denial of his request to represent himself or request removal of father's counsel. The role of a guardian ad litem appointed to represent a parent in a parental-termination proceeding is "to investigate the ward's situation and then to ask the court to do what the guardian feels is in the ward's best interest." *In re Baby Girl Baxter*, 17 Ohio St.3d 229, 232, 479 N.E.2d 257 (1985). The appointment of a guardian ad litem adds an additional level of protection for the parent and "works to ensure that the parent's rights are not compromised." *In re Moore*, 12th Dist. Butler No. CA99-09-153, 2000 WL 1252028, at *6. Accordingly,

14

the guardian ad litem plays a protective role when it comes to waiver of his or her ward's rights. *See In re Etter*, 134 Ohio App.3d 484, 490, 731 N.E.2d 694 (1st Dist.1998). Father's guardian ad litem did not express any disagreement with the trial court's decision to deny father's request to represent himself. There is also nothing in the record to indicate that father's guardian ad litem was not adequately performing his role in protecting father's rights and father has made no such argument here. *See State v. Murphy*, 8th Dist. Cuyahoga No. 82945, 2004-Ohio-638, ¶ 18 ("[I]t must be presumed that a properly licensed attorney executes his legal duty in an ethical and competent manner." (Citations omitted.)). Therefore, father cannot establish error, much less plain error, in the trial court's decision. Accordingly, this assignment of error is overruled.

### Third Assignment of Error

{¶32} In his third assignment of error, father argues that the trial court failed to safeguard his constitutional rights by removing father from the courtroom and not providing an alternative method for father to view the proceedings. This is again an issue that was not objected to or in any way raised before the trial court. Therefore, father has waived all but plain error. *Goldfuss*, 79 Ohio St.3d at 121, 679 N.E.2d 1099.

{¶33} On the second day of trial, right after denying father's request to represent himself, the court informed father that the court needed him to remain silent when the proceedings were going on. The court then told him he will get three warnings and, upon number three, "you're out or worse." The court did not discuss the three strikes rule again, despite multiple interruptions by father, until about halfway through the final day of trial. At that time, the court informed father that he now had the first strike. A little while later, the court issued a second strike. Father

15

responded, "I'm ready to go ma'am. I think you're a kangaroo court. I really do. I mean, you don't – you don't present evidence." The court then told him, "I don't want to exclude you and I certainly don't want to hold you in contempt." Sometime later, the court again told father that it did not want to exclude him but that it would have no choice if he continued to disrupt the proceedings. Father continued to commentate aloud on the witness's testimony and the court ignored it. Finally, toward the end of Amanda Klosterman's testimony, father again began to commentate aloud on the witness's testimony and the court removed father from the courtroom for the remainder of Klosterman's testimony. Father's trial counsel and his guardian ad litem remained in the room during the remainder of her testimony. Father was then brought back into the courtroom to testify after a short recess at the conclusion of Klosterman's testimony.

{¶34} "The trial court has board discretion to control the proceedings before it." *In re H. Children*, 1st Dist. Hamilton No. C-190630, 2020-Ohio-774, ¶ 41. Additionally, the law will not allow a person to take advantage of his own wrong in a civil or a criminal case. *Id.*, citing *State v. Phillips*, 34 Ohio App.2d 217, 220, 299 N.E.2d 286 (1st Dist.1972). This court has held that a juvenile court does not act outside its discretion when removing a parent from the courtroom in a parental-termination hearing where the parent is removed due to his own behavior and his guardian ad litem, acting as standby counsel, is present for the proceedings. *See id.*

{¶35} Here, father was removed from the courtroom for a portion of the testimony of one witness. He was removed due to his own behavior after he was given ample warnings that he would be removed if he persisted in his behavior. He was represented by his trial counsel and his guardian ad litem during his absence. Thus, the trial court did not act outside its discretion when removing father.

16

Therefore, on the record below, father cannot establish error, much less plain error, in the court's decision.  Accordingly, this assignment of error is overruled.

*Fourth Assignment of Error*

**{¶36}** In his fourth assignment of error, father asserts six instances where the trial court allegedly erred by admitting inadmissible evidence.  Three of those instances relate to the testimony of Alison Campbell, and three of those instances relate to the testimony of Emily Lutie.  We will first address the arguments related to Campbell's testimony.  These arguments are based on the following testimony in the trial court:

Varney:[3]   What – what was the nature of the conversation that you had personally had with [father]?

Campbell: With [father]?  We had multiple conversations over the phone, and then he also left me a significant amount of voicemails.  Typically, when I was speaking with [father], he was denying the things that he was being accused of doing.  We had conversations about my concerns with his violence, with his control over –

Lindgren:[4] Objection, your honor.  Calls for – she stated facts that are not in evidence.

Court:    Well didn't she specifically say conversations about her concerns?

Lindgren: Oh, I am.  I'm saying that there's no evidence that [father] had – was domestically violent towards –

---

[3] Nicholas Varney, attorney for HCJFS.
[4] Lawrence Lindgren, attorney for father.

17

Court:     No.  But all she's saying is her concerns.  And she's allowed to tell the court what her concerns were –

Lindgren:  Thank you.

Court:     – Regardless of what –

Lindgren:  I got it.  Go ahead.  I'm sorry.  I apologize.  I'm sorry.  I didn't mean to –

Campbell:  It's okay.  No.  So we discussed – he indicated that she [sic] was not violent with [mother].  We discussed that she had – we discussed my concerns that she had injuries on her and that she had been assaulted after the emergency hearing where the children were taken.  He indicated to me that a person named Rae broke into the hospital and had assaulted her.  And we verified that that wasn't true, no one broke into U.C. Hospital.

Lindgren:  Objection, your honor.  There's a whole bunch of hearsay in this.

Father:    She's crazy.

Court:     Overruled.  Go on.

Campbell:  And then I also – regarding the assault after the emergency order, I met with [mother] in person.  And she indicated that he was hitting her and that he had assaulted her after the hearing.  She indicated that she – at that point when I had met with her, she had just jumped from a vehicle, because he was being mean to her, she [sic] was controlling her.  She has been in Crossroads, and she indicated she had

18

left crossroads because he wouldn't give her her birth certificate or Social Security card. They were locked in a storage shed and he refused to give her access. I also met with [mother] another time. I had received a call from a social worker who was working with the police at a homeless camp and had found [mother], and she was struggling with her mental health significantly. And so I had them –

Lindgren: Objection, your honor. Again foundation.

                     \* \* \*

Court: For the time being go on.

Varney: Thank you, your honor.

Campbell: Okay. When [mother] and I had met – I asked them to send her over to the building and so we met. She indicated she had been off her meds, because [father] had her medication and he refused to give them to her. Going back to my conversation with [father], again a lot of the conversations I struggled to keep up with. They were rambling, kind of incoherent. But he again was denying his involvement. He – you know, everyone was against him and that – he indicated that, you know, when him and [mother] had gotten together and they weren't together, that he was involved with her mother and her mother knew that she – that –

Father: That's false.

Campbell: – she – that he was moving in. They picked him up. And then he wasn't aware of her age at the time, but he later learned that her age was underage. However, they continued a relationship and then had a child when [mother] was underage. And so he denied any domestic assaults that had occurred in Minnesota. He also denied that he assaulted his sister in Kentucky, which, according to Cabinet records in Kentucky, he had assaulted her, had kept her –

Lindgren: Objection, your honor. Hearsay.

{¶37} First, father asserts that Campbell's statement that refuted father's claim that someone broke into the hospital was inadmissible hearsay. Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered into evidence to prove the truth of the matter asserted." Evid.R. 801(C). Hearsay is inadmissible unless a valid exception applies. *In re McLemore*, 10th Dist. Franklin Nos. 03AP-714 and 03AP-730, 2004-Ohio-680, ¶ 8, citing Evid.R. 802.

{¶38} Campbell testified that she verified that father's claim was not true and that no one broke into the hospital. She did not discuss any out of court "statement." "There is no 'statement' for hearsay purposes where a witness does not testify about 'what someone else said, wrote, or did.' " (Citations omitted.) *State v. Wingfield*, 8th Dist. Cuyahoga No. 107196, 2019-Ohio-1644, ¶ 32. Therefore, this testimony was not hearsay, and the objection was properly overruled.

{¶39} Next, father asserts that Campbell's testimony that mother said father was the one who assaulted her was inadmissible hearsay. Although father made an

objection to foundation in relation to this testimony, no hearsay objection was made to the trial court. Thus, our review here is restricted to plain error. *See In re D.W.*, 8th Dist. Cuyahoga No. 84547, 2005-Ohio-1867, ¶ 26. " '[T]he erroneous admission or exclusion of hearsay, cumulative to properly admitted testimony, constitutes harmless error.' " *In re P.C.*, 3d Dist. Logan Nos. 8-20-39, 8-20-40, 8-20-41, 8-20-45, 8-20-46 and 8-20-47, 2021-Ohio-1238, ¶ 68. Mother testified that father was the one who assaulted her. Thus, the inclusion of this testimony, even if the testimony constitutes hearsay, is harmless error and therefore cannot rise to the level of plain error.

{**¶40**} Lastly, father asserts that Campbell's testimony that mother said father was keeping her medication from her was inadmissible hearsay. No hearsay objection was made to the trial court regarding this testimony. Thus, our review here is restricted to plain error. *See In re D.W.* at ¶ 26. Without any citation to legal authority, father argues that the admission of this testimony rises to plain error because it improperly bolstered the case of the opposing parties. However, even if this testimony was admitted in error, we fail to see how this is the extremely rare case involving exceptional circumstances where the error seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself. Because we fail to find plain error here, this portion of the assignment of error is overruled.

{**¶41**} We now address the arguments related to Lutie's testimony. First, father argues that Lutie's testimony regarding what she saw in reports concerning why father's visits were stopped was inadmissible hearsay. This argument is based on the following testimony in the trial court:

21

Clore:[5]     Can you explain to me why the visits stopped for [father] at the time?

Lutie:     At the time, which is December/ later December of 2018, visitation stopped, because when –

Lindgren:     Objection, your honor.

Court:     Hold on. Mr. Lindgren?

Lindgren:     I think we need a foundation as to how she knows this. Was she there? Was she a part of that?

Court:     Well, I think now we're into sort of a business record situation. You're testifying from the records you reviewed; is that correct? Are those records something that you would normally keep in the course of business?

Lutie:     Yes.

Court:     I think she can –

Lindgren:     Your honor, I agree that if it's a business record it may come in. We could argue that as well. However, right now this is hearsay. She's quoting from a business record which is a report that somebody else made on paper record. This is –

Father:     Hearsay.

Lindgren:     – double hearsay.

Father:     H-huh.

Lindgren:     You could – double hearsay.

---

[5] Edward Clore, guardian ad litem for the children.

Court: Overruled. Go ahead.

Lutie: So FNC send JFS regular reports, regular written reports, that give great detail about when a visit started at FNC, when it ended, how the parents greeted the children, how they left the visit, as well as what was talked about during the visit, what they did during the visit. So we have a very detailed record of what happened specifically in the last visit. So his visitation – [father's] visitation was stopped, because he was engaging in visitation with [B.W. and J.H.] at FNC, and he continued to reference the case. He continued to ask about foster parents, about how the children had been treated in their foster home. There was also an instance in which some of the behaviors of the children made [father] concerned about sexual abuse.

Lindgren: Excuse me, your Honor. I'm sorry. I'm so concerned about this line – I'm so concerned about it this line of questioning that I'm going to object yet again. And again she's quoting from apparently some report she saw. It's routine that we get reports from visitation centers in here. I've not seen that. She's still trying to introduce, from her memory, what these said. So I think you get that point.

Varney: Your Honor, [father] testified extensively yesterday about what happened at the visit that turned out to be the last visit. He indicated a number of observations that he made about the children. He indicated that he was escorted out

23

of the building by a sheriff. I don't think this is new information. This is just the caseworker responding with the same information that [father] provided the Court directly yesterday in his testimony.

Court: I think there's been sufficient background testimony for her to testify at this time on this. I'm concerned in general about the whole case relying on a lot of records that we apparently either aren't going to get into evidence – and I think we might need to talk about that before we adjourn for the day.

Varney: If I can –

Father: Yes, ma'am.

Varney: – let the court know what I intend to submit as evidence, may be [sic] that assuage some of the Court's fears.

Court: Okay. Well, we'll get to that. But for right, now [sic] to address Mr. Lindgren's objection, I'm going to overrule it, because there's been sufficient background testimony. Go ahead.

Fidler:[6] Your Honor, if I could – if I could just say something, I think part of the issue is we're hearing also dispositional evidence along with adjudicatory evidence.

---

[6] Mark Fidler, guardian ad litem for father.

Court:     And I think it's inevitable in any of these cases. You're absolutely right. We are. But I don't know how we cannot. I understand the point that you're making. Go ahead.

Lutie:     Thank you. So at a certain point in the visit, there was some behaviors by the children that made [father] concerned about sexual abuse of the children in their foster placement, and that caused him to ask leading questions like, who needs – or, who is doing this to you; if somebody is touching you in between your legs, you need to tell me. The kind of stuff he was saying, and that is what eventually led to the sheriff being called and they had to escort him out of the building. Because he would not listen to the FNC facilitator that kept trying to redirect him as far as talking about the case and this line of leading and sexualized questioning.

{¶42} Lutie's testimony was based on her review of a visitation report from the Family Nurturing Center ("FNC"), and this report was not admitted into evidence. Thus, her testimony was hearsay and " '[t]here is no hearsay exception, either in Evid.R. 803 or 804, that allows a witness to give hearsay testimony of the content of business records based only upon review of the records.' " *In re McLemore*, 10th Dist. Franklin Nos. 03AP-714 and 03AP-730, 2004-Ohio-680, at ¶ 9, quoting *St. Paul Fire & Marine Ins. Co. v. Ohio Fast Freight, Inc.*, 8 Ohio App.3d 155, 157, 456 N.E.2d 551 (10th Dist.1982). However, we must still determine whether the admission of this testimony was harmless error. *Id.* "[S]ince the judge acts as the factfinder and is presumed to be able to disregard hearsay statements, the

person against whom the hearsay statements are admitted in such a case must show that the statements were prejudicial or that the judge relied upon them in making his decision." *In re Sypher*, 7th Dist. Belmont No. 01-BA-36, 2002 WL 378333, *2 (Mar. 11, 2002), citing *In re Vickers Children*, 14 Ohio App.3d 201, 206, 470 N.E.2d 438 (12th Dist.1983); *see In re Sherman*, 3d Dist. Hancock Nos. 05-04-47, 05-04-48 and 05-04-49, 2005-Ohio-5888, ¶ 20.

{¶43} Father asserts that the admission of this evidence was prejudicial because it improperly bolstered the case of the opposing parties; however, he does not cite to any legal authority in support of this general assertion. Contrary to father's assertion, we find the admission of this testimony to be harmless error. This testimony is largely cumulative of father's testimony to the court the day before on why his visits were terminated. Father testified that his visits were terminated because the girls exhibited behavior that indicated sexual abuse, so he asked them if they were being abused in their current placement. He then testified that, as a result, he was escorted out of the building. The only pieces of Lutie's testimony that were arguably not already stated in father's previous testimony were the statements that father asked the girls if they were being touched between their legs and that father would not listen when the FNC facilitator tried to redirect him. The record does not indicate, and father does not argue, that the trial court relied on these statements when rendering its decision. Therefore, we find the admission of this evidence to be harmless error.

{¶44} Next, father argues that Lutie's testimony that mother reported to multiple law enforcement agencies that father assaulted her was inadmissible hearsay. However, the record shows that the trial court sustained father's objection to this testimony. Therefore, the record does not reflect the complained of error.

**{¶45}** Finally, father argues that the trial court improperly allowed Lutie to give her opinion on father's credibility.

Lindgren: But you did talk to [father] about your concerns about his violence; is that correct?

Lutie: Yes.

Lindgren: Okay. And so he had denied being violent with [mother]?

Lutie: Yes, he has.

Lindgren: Okay. Now, when you talk to [mother], you believe what she says?

Lutie: Yes.

Lindgren: And at the same time you do not believe [father] when he tells you something?

Lutie: That is not necessarily the case.

Lindgren: So you do believe what he says? You believe that he's not violent?

Lutie: I don't – I believe that he is violent, but – because of other evidence which shows he is.

Lindgren: So you're saying you don't believe [father]?

Lutie: Not about his being non violent, no.

Lindgren: Okay.

Father: Where's the evidence, sir? Ask her, please.

Lindgren: Now, you've had many – you've had interaction with [father], right?

Lutie: I've had several, yes.

Lindgren: And is it fair to say that he – in his presentation to you, he is enthusiastic?

Lutie: Yes.

27

Lindgren: I'm starting from the bottom. Okay? Enthusiastic?

Lutie: Yes.

Lindgren: And he is eager to tell you his side of the story; is that correct?

Lutie: He is.

Lindgren: He's insistent?

Lutie: He is.

Lindgren: And sometimes his voice raises slightly?

Lutie: I believe it raises more than slightly.

Lindgren: Okay. But he's not yelling at you?

Lutie: Not me personally, no.

Lindgren: Okay. Do you believe this might have something to do with whether or not you believe [father]?

Lutie: I'm not sure.

Lindgren: A very honest answer. Thank you. You don't know the question or you seriously don't know whether that is influencing you?

Lutie: I believe that he has a [sic] extensive history that would suggest otherwise.

{¶46} Father argues that the trial court erred by allowing Lutie's responses to father's trial counsel's questions because the testimony was improper opinion testimony under Evid.R. 608. We note that this testimony was elicited by father's trial counsel without objection. We also note that father did not identify which specific statement he is alleging constituted improper evidence. After reviewing the record, we fail to see how any of this testimony would be considered improper opinion testimony under Evid.R. 608. Therefore, this portion of the assignment of error is overruled.

*Fifth Assignment of Error*

{¶47} In his fifth assignment of error, father argues that HCJFS failed to establish, by clear and convincing evidence, that J.H. and B.W. were abused, neglected, and dependent. An adjudication must be supported by clear and convincing evidence. *In re M.R.*, 1st Dist. Hamilton No. C-190547, 2020-Ohio-3648, ¶ 22. Clear and convincing evidence is "evidence sufficient to produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established." (Citation omitted.) *Id.* "We 'must examine the record and determine if the trier of fact had sufficient evidence before it to satisfy this burden of proof.' " (Citation omitted.) *Id.*

{¶48} In relevant part, R.C. 2151.35(A)(1) states, "If the court at the adjudicatory hearing finds from clear and convincing evidence that the child is an abused, neglected, *or* dependent child, the court shall proceed, in accordance with division (B) of this section, to hold a dispositional hearing and hear the evidence as to the proper disposition to be made under section 2151.353 of the Revised Code." (Emphasis added.) Thus, the court is only required to find one of the three possible adjudications before proceeding to the dispositional phase. Here, the trial court adjudicated J.H. and B.W. abused, neglected and dependent.

{¶49} Father argues there was insufficient evidence to establish that J.H. and B.W. were abused, neglected, and dependent because father (1) rose to the occasion to take care of his children when they were in need, (2) called the police when he found out they were sleeping outside, (3) sought to file for temporary custody of the children, (4) cared for J.H. and B.W. when mother was in the hospital, (5) cared for his children and took them to the doctor regularly, and (6) testified that he never assaulted mother in front of the children.

29

{¶50} An "abused child" includes any child who is endangered by being placed at a substantial risk to their health and safety when their parent violates a duty of care, protection, or support. *See* R.C. 2151.013(A)(B) and 2919.22(A). The trial court found that J.H. and B.W. were abused because they have witnessed repeated acts of physical violence perpetrated by their father against their mother and have at least one time each been physically involved in acts of violence between the parents.

{¶51} Mother testified that there were many occasions when father put his hands on her and that she knew the children were present during all those occasions because she was the only person that watched her children. Additionally, HCJFS's exhibit one is a copy of the previous judicial entry of the trial court adjudicating J.H. and B.W. abused and dependent under the initial complaint filed in this case. Father did not object to the admission of this exhibit. In the entry, the trial court describes two recent instances where J.H. and B.W. themselves were involved in the domestic violence–one where J.H. was knocked over during an incident and one where B.W. was being pulled in opposite directions during an incident. Therefore, clear and convincing evidence in the record exists to support the trial court's finding that J.H. and B.W. were abused. This adjudication was sufficient for the trial court to proceed to disposition under R.C. 2151.353. *See* R.C. 2151.35(A)(1) and 2151.353(A). Therefore, this assignment of error is overruled.

## Sixth Assignment of Error

{¶52} In his final assignment of error, father argues that HCJFS failed to establish, by clear and convincing evidence, that it should be given permanent custody of J.H. and B.W. "A trial court's award of permanent custody must be supported by clear and convincing evidence, and we will not substitute our judgment

for the trial court's when its decision is supported by competent, credible evidence." *In re C.L.*, 1st Dist. Hamilton No. C-170169, 2017-Ohio-7184, ¶ 17, citing *In re W.M.*, 1st Dist. Hamilton No. C-170003, 2017-Ohio-1398. ¶ 14. "Our review for sufficiency asks whether some evidence exists on each element. It is a test of adequacy, and whether the evidence is sufficient to sustain the judgment is a question of law." *In re D.M.*, 1st Dist. Hamilton No. C-200043, 2020-Ohio-3273, ¶ 21, citing *In re A.B.*, 1st Dist. Hamilton No. C-130401, 2013-Ohio-4460, ¶ 15. "Our review of the weight of the evidence 'asks whether the evidence on each element satisfies the burden of persuasion, which in this case was a clear and convincing standard.' " *Id.*

{¶53} "Ohio law provides two ways an agency may obtain permanent custody of a child." *In re R.B.*, 1st Dist. Hamilton Nos. C-190319 and C-190331, 2019-Ohio-3469, ¶ 10. "The agency may first obtain temporary custody of the child and then file a motion for permanent custody, or the agency may request permanent custody as part of its original abuse, neglect, or dependency complaint." *Id.*, citing R.C. 2151.413, R.C. 2151.27(C), R.C. 2151.353(A)(4), and *In re E.P.*, 12th Dist. Fayette No. CA2009-11-022, 2010-Ohio-2761, ¶ 22. If the agency requests permanent custody as part of its original abuse, neglect, or dependency complaint, the court must undergo an analysis of the two-prong test laid out in R.C. 2151.353(A)(4). *See id.* R.C. 2151.353(A)(4) provides:

> (A) If a child is adjudicated an abused, neglected, or dependent child, the court may make one of the following orders of disposition:
>
> * * *
>
> (4) Commit the child to the permanent custody of a public children services agency or private child placing agency, if the court determines in accordance with division (E) of section 2151.414 of the

31

Revised Code that the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent and determines in accordance with division (D)(1) of section 2151.414 of the Revised Code that permanent commitment is in the best interest of the child. If the court grants permanent custody under this division, the court, upon the request of any party, shall file a written opinion setting forth its findings of fact and conclusions of law in relation to the proceeding.

{¶54} In this case, HCJFS filed for permanent custody as part of the original complaint filed on November 2, 2020. Thus, the court was required to undergo the two-pronged test laid out above in R.C. 2151.353(A)(4).

Step One: R.C. 2151.414(E) Determination

{¶55} In the juvenile court's opinion, at the beginning of the permanent-custody analysis, the court first stated, "In order for the Court to award permanent custody of a child to an agency, the court must consider the requirements of ORC 2151." Thus, the court does not reference a specific statute at this point. Next, the court cited to R.C. 2151.414(E) for the first prong of the test, but erroneously found that R.C. 2151.414(E) required a finding that the children had been in placement for 12 of the previous 22 months. "In a request for permanent custody as part of the original complaint, the '12 of 22' provision is only relevant under the second prong when considering the best interests of the children." *In re R.B.*, 1st Dist. Hamilton Nos. C-190319 and C-190331, 2019-Ohio-3469, at ¶ 12.

{¶56} The trial court's entry does not make any other statutory findings before continuing on to the best-interest determination. The court does not cite to R.C. 2151.353 anywhere in the entry. While a trial court need not specifically

enumerate any required factors to be considered in R.C. 2151.414, there must be some indication that all the necessary factors were considered. *See In re K.T.1*, 1st Dist. Hamilton Nos. C-170667, C-170687, C-170701, C-170702 and C-170707, 2018-Ohio-1381, ¶ 14 (reversing and remanding the judgment of the trial court where the opinion was devoid of any indication the trial court considered the required factors in R.C. 2151.414(D)(1)); *see also In re B/K Children*, 1st Dist. Hamilton No. C-190269, 2019-Ohio-5503, ¶ 18.

{¶57} The trial court's entry fails to show that the court considered the appropriate factors under R.C. 2151.414(E) as required by R.C. 2151.353(A)(4). Therefore, we must reverse the judgment of the trial court solely on this basis and remand the cause with instructions to the juvenile court to undergo the analysis required by R.C. 2151.353(A)(4) and to properly consider the relevant factors under R.C. 2151.414(E).

Step Two: R.C. 2151.414(D)(1) Determination

{¶58} Under the second prong, the juvenile court must determine whether granting permanent custody to the agency is in the best interest of the children. In relevant part, R.C. 2151.414(D)(1) provides:

> In determining the best interest of the child at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) or (5) of section 2151.353 or division (C) of section 2151.415 of the Revised Code, the court shall consider all relevant factors, including, but not limited to, the following:
>
> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

33

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

"No single factor is given greater weight or heightened significance." *In re D.M.*, 1st Dist. Hamilton No. C-200043, 2020-Ohio-3273, at ¶ 47, citing *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 57.

{¶59} When considering the best-interest factors, the juvenile court found that the children have been in foster care since this litigation began in 2018 and that the children were in need of a legally secure placement that could not be provided by either parent within a reasonable time. The court noted that father had documented "mental health issues" and that he had not completed the recommended mental-

34

health treatment. The court also noted that father had not documented a stable home into which to bring the children. Lastly, the court noted that the children were too young to express their opinions. These findings are supported by the record.

{¶60} The court explicitly stated that it considered all the enumerated factors in R.C. 2151.414. It is clear from the juvenile court's entry that it considered the relevant best-interest factors and clear and convincing evidence was presented to support the juvenile court's best-interest determination. Therefore, the juvenile court's best-interest determination is affirmed, and this portion of the assignment of error is be overruled.

## Conclusion

{¶61} For the foregoing reasons, we overrule the first, second, third, fourth, and fifth assignments of error. We overrule the sixth assignment of error in part but sustain the sixth assignment of error to the extent that the trial court's entry failed to show that the court considered the appropriate factors under R.C. 2151.414(E) as required by R.C. 2151.353(A)(4). Therefore, we remand the cause to the trial court solely to consider the appropriate factors under R.C. 2151.414(E), as required by R.C. 2151.353(A)(4), and to enter a judgment accordingly.

Judgment affirmed in part, reversed in part, and cause remanded.

**CROUSE** and **WINKLER, JJ.,** concur.

Please note:

The court has recorded its own entry this date.

35