[Cite as *In re W.W.*, 2023-Ohio-2149.]

| | | |
|---|---|---|
| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

IN RE: W.W.
     E.W.

C.A. No.     30404

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.     DN 21 12 0979
                DN 21 12 0980

DECISION AND JOURNAL ENTRY

Dated: June 28, 2023

HENSAL, Presiding Judge.

{¶1} Appellant Mother appeals the judgment of the Summit County Court of Common Pleas, Juvenile Division, that placed her children in the legal custody of Appellee Father and closed the cases. This Court affirms.

I.

{¶2} Mother and Father are the biological parents of W.W., born December 16, 2012, and E.W., born August 28, 2014. The parents were never married, although they lived together with the children until sometime in 2017. Father continued to live near Mother and the children until he moved to Kentucky in August 2019, for work. In August 2020, Father moved to Indiana when his employer again relocated him.

{¶3} In 2014, when Mother was pregnant and about to give birth to E.W., she contacted Appellee Summit County Children Services Board ("CSB" or "the agency") for help because she was feeling suicidal. Mother agreed to a voluntary safety plan under which CSB placed W.W.

with a maternal aunt and uncle ("Aunt" and "Uncle," respectively), while Mother went to the hospital to give birth. Because Mother tested positive for amphetamines at the hospital, however, the agency took both W.W. and E.W. into protective custody and placed them with Aunt and Uncle. Both children were adjudicated dependent. Within a month, CSB returned the children to the parents' home in Father's temporary custody. In 2015, W.W. and E.W. were returned to the parents' legal custody and those dependency cases were closed.

{¶4} While Father continued to live in Ohio, the children spent two days each week and every other weekend in his care. After he left the state, he obtained a court order granting him approximately five weeks of visitation with the children each year. Father also had the right to speak with the children by telephone three times a week. He consistently exercised these rights.

{¶5} In November 2021, E.W. called the police as he and W.W. witnessed Mother's live-in boyfriend physically assaulting her. When a CSB intake caseworker arrived to investigate the alleged domestic violence in the home, Mother admitted that she was depressed and suicidal and that she had left the children to care for themselves for three days while she remained in bed. Mother voluntarily agreed to check herself into a hospital for a mental health evaluation and treatment in lieu of an involuntary commitment. Because Father was living in Indiana, working nights, and only had limited physical contact with the children, CSB took the children into custody and filed complaints alleging that they were abused, neglected, and dependent. The agency again placed the boys in the home of Aunt and Uncle.

{¶6} Mother and Father both attended the adjudicatory hearing with separate counsel. Both parents waived their rights to a hearing and stipulated to a finding that the children were dependent. CSB withdrew its remaining allegations. The magistrate adjudicated W.W. and E.W.

dependent children and left the matter of visitation in the discretion of CSB and the guardian ad litem.

{¶7} CSB filed a proposed case plan. Mother's sole objective was to obtain a mental health assessment, follow all recommendations, and develop appropriate skills for coping and interacting with the children. Father was required to maintain a safe and stable home environment and an income source adequate to meet the children's basic needs; visit regularly with the children; and cooperate with a background check, home study, and/or an Interstate Compact for the Placement of Children ("ICPC") assessment, if necessary. The case plan required the children to have psychological or psychiatric evaluations and work on managing their emotions. Mother and Father were required to participate in the children's counseling when the therapists deemed that appropriate.

{¶8} Prior to the initial dispositional hearing, Father moved for legal custody. CSB did not file a dispositional motion. At the hearing, however, the assistant prosecutor asserted on behalf of the agency that CSB supported Father's motion. The guardian ad litem also recommended legal custody to Father with no additional oversight by CSB or the court. Mother's attorney conceded that Mother was not in a position to regain custody of the children at that time. Instead, Mother's counsel requested that the juvenile court deny Father's motion and keep the cases open to give Mother time to work on her case plan objectives. Counsel asserted that the brevity of the cases precluded a finding that legal custody to Father was in the children's best interest because W.W. and E.W. had never resided for any significant time with Father or outside of Ohio.

{¶9} The evidentiary hearing proceeded before the magistrate. While Father presented a case in chief, CSB did not. Mother presented her case in chief, and the hearing concluded with

the testimony of the guardian ad litem. Thereafter, the magistrate issued a decision granting Father's motion for legal custody and closing the cases.

{¶10} Mother filed timely objections to the magistrate's decision. She argued that (1) the determinations to close the cases and award legal custody to Father, which necessitated the children's relocation outside Ohio, were contrary to the evidence as to the best interest of the children; and (2) prior to placing the children out of state, CSB was required to facilitate an evaluation and obtain an acceptance by the receiving state of Indiana pursuant to the ICPC. No party filed an opposition to Mother's objections, although Father and the guardian ad litem filed a joint motion to lift the automatic stay occasioned by Mother's filing of objections. The juvenile court lifted the automatic stay pending a later hearing on the motion to lift the stay,[1] freeing Father to take physical possession of the children while Mother's objections were pending. Father had already relocated the children to his home in Indiana based on the magistrate's earlier enunciated effective date of the legal custody award.

{¶11} Thereafter, but before the juvenile court ruled on Mother's objections, Mother moved to modify visitation. She alleged that she had not seen the children in more than a month because Father was not allowing her visitation. Mother requested an order granting her visitation every other weekend, or alternatively, one weekend each month, plus the standard order of visitation regarding holidays.[2]

---

[1] That subsequent hearing never took place.

[2] Three weeks after the juvenile court issued its final judgment, the magistrate held a "status hearing." Father was present with his attorney. Mother was present but not represented by counsel. Although the magistrate noted in his order that Mother "plans" to hire an attorney to prosecute her motion to modify visitation, the magistrate nevertheless issued an order after "a discussion in open court" granting Mother parenting time on the first weekend of every month. The order made no reference to supervision. While the order did not schedule an evidentiary hearing on Mother's motion, it scheduled another "status hearing" six weeks later.

{¶12} The juvenile court issued a judgment overruling Mother's objections. The trial court found that the preponderance of the evidence supported the findings that legal custody to Father and closing the cases were in the best interest of the children. In addition, the court found that an ICPC screening was not required pursuant to the exception set forth in R.C. 5103.20 Article III.(B)(4). The juvenile court awarded legal custody of W.W. and E.W. to Father and docketed the children's cases closed. Mother timely appealed and raises two assignments of error for review.

II.

## ASSIGNMENT OF ERROR I

THE [JUVENILE] COURT COMMITTED REVERSIBLE ERROR TO MOTHER'S GREAT DETRIMENT WHEN IT DETERMINED THAT IT WAS IN THE BEST INTEREST OF THE CHILDREN TO CLOSE THE CASE AT THE FIRST DISPOSITION NOTWITHSTANDING THE CASE[ ] PLAN.

{¶13} Mother argues that the juvenile court's judgment awarding legal custody of W.W. and E.W. to Father is contrary to the best interest of the children. This Court disagrees.

{¶14} As an initial matter, to the extent that Mother raises issues relating to the children's dependency adjudications and various due process concerns, we may not consider those as Mother failed to preserve those issues for appeal. Juv.R. 40(D)(3)(b)(iv) precludes a party from assigning as error on appeal any finding of fact or conclusion of law unless the party first objected to that finding or conclusion as required by Juv.R. 40(D)(3)(b). Accordingly, a party may not raise an issue for the first time on appeal where the party has not first raised the issue in objections to the magistrate's decision. *In re J.J.*, 9th Dist. Summit No. 29534, 2020-Ohio-2808, ¶ 10. In the absence of a claim of plain error, Mother has forfeited those issues on appeal. *See* Juv.R. 40(D)(3)(b)(iv).

{¶15} As to Mother's assigned error, this Court has held:

On appeal, an award of legal custody will not be reversed if the judgment is supported by a preponderance of the evidence. Preponderance of the evidence entails the greater weight of the evidence, evidence that is more probable, persuasive, and possesses greater probative value. In other words, when the best interest of the child is established by the greater weight of the evidence, the trial court does not have discretion to enter a judgment that is adverse to that interest. Thus, our standard of review is whether a legal custody decision is against the manifest weight of the evidence.

(Internal citations and quotations omitted.) *In re M.F.*, 9th Dist. Lorain No. 15CA010823, 2016-Ohio-2685, ¶ 7.

**{¶16}** In considering whether the juvenile court's judgment is against the manifest weight of the evidence, this Court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new [hearing] ordered." (Internal quotations omitted.) *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. When weighing the evidence, this Court "must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21.

**{¶17}** "Following an adjudication of neglect, dependency, or abuse, the juvenile court's determination of whether to place a child in the legal custody of a parent or a relative is based solely on the best interest of the child." *In re K.H.*, 9th Dist. Summit No. 27952, 2016-Ohio-1330, ¶ 12. The statutory scheme regarding an award of legal custody does not include a specific test or set of criteria, but Ohio courts agree that the juvenile court must base its decision to award legal custody on the best interest of the child. *In re B.B.*, 9th Dist. Lorain No. 15CA010880, 2016-Ohio-7994, at ¶ 18, quoting *In re N.P.*, 9th Dist. Summit No. 21707, 2004-Ohio-110, ¶ 23. In that regard, the juvenile court is guided by the best interest factors enunciated in Revised Code Section 2151.414(D) relating to permanent custody. *In re B.G.*, 9th Dist. Summit No. 24187, 2008-Ohio-5003, ¶ 9, citing *In re T.A.*, 9th Dist. Summit No. 22954, 2006-Ohio-4468, ¶ 17. Those factors

include the interaction and interrelationships of the child, the child's wishes, the custodial history of the child, the child's need for permanence, and whether any of the factors in Section 2151.414(E)(7)-(11) are applicable. R.C. 2151.414(D)(1)(a)-(e); *see also In re B.C.*, 9th Dist. Summit Nos. 26976 and 26977, 2014-Ohio-2748, ¶ 16.

{¶18} In addition, the juvenile court may also look to the best interest factors in Section 3109.04(F)(1) for guidance. *In re K.A.*, 9th Dist. Lorain Nos. 15CA010850 and 15CA010860, 2017-Ohio-1, ¶ 17. While some factors overlap with those above, others include the child's adjustment to his or her environment; the mental and physical health of all persons involved; the parents' history of providing support and honoring companionship orders; certain indicia of violence, abuse, or neglect in any household involved; and whether a parent plans to or has established a residence outside of Ohio. R.C. 3109.04(F)(1).

{¶19} Until CSB first removed the children in 2014, W.W. and E.W. were in Mother's legal custody, but also living with Father. The juvenile court placed the boys in Father's temporary custody before shortly thereafter placing them in both parents' legal custody. The family resided together until the boys were five and three years old. At that time, Mother left the home, taking the children with her, and Father obtained a visitation order granting him approximately 12 days each month with the boys. When his employer transferred him out of state, Father continued to exercise his modified visitation to its fullest extent. That included five weeks of in-person visits per year and telephone conversations three times each week.

{¶20} The children have had life-long relationships with Mother and Father, enjoying a close bond with each and loving both parents "immensely," according to the caseworker. The boys are comfortable with Father and behave well while in his care. On the other hand, there is significant tension between W.W. and Mother, evidenced by W.W.'s verbal and physical

aggression towards her. Mother testified regarding W.W.'s "very explosive behaviors" and defiance towards her since 2019, behaviors not exhibited by the child in the homes of Father or Aunt and Uncle. Both children expressed discomfort regarding Mother's live-in boyfriend whose assault on Mother necessitated E.W.'s call to the police.

{¶21} The boys have a supportive and loving relationship with Aunt and Uncle with whom they were placed during both the instant and 2014 cases. Both parents also maintain a good relationship with Aunt and Uncle which has created a neutral environment for the children during their placement. Mother and Father have both facilitated a relationship between the children and their paternal grandmother who has visited regularly with the boys. In fact, the children recently enjoyed three weeks in her care while Aunt and Uncle went on vacation.

{¶22} The caseworker and guardian ad litem spoke with the children throughout the case regarding their wishes for custody. Initially, the boys told the caseworker that they wanted to live with Mother but only as the situation used to be, specifically "where there's not fighting going on[,]" and Mother was preparing meals and helping them with homework. During the last two months of the cases, however, W.W. and E.W. both consistently asserted that they wanted to live with Father. The boys told the guardian ad litem that it had been a long time since "things were normal" in Mother's home, as Mother was frequently unable to get out of bed to care for them.

{¶23} The guardian ad litem opined that an award of legal custody to Father was in the children's best interest and that protective supervision was unnecessary. She reported that Father has been involved with the children their whole lives and that he was healthy and demonstrated the ability to provide adequate care for them. The guardian ad litem emphasized that Father was not involved in the underlying circumstances which led to the children's removal, and that there

was no reason to delay reunification with the parent capable of providing a safe and stable home for the boys.

{¶24} W.W. and E.W. were nine and seven years old, respectively, at the time of the hearing. While Mother was their primary caregiver for the past few years, they were removed from their home twice based on the impact of Mother's mental health issues on their well-being. Even when CSB was not involved with the family, Mother admitted to being hospitalized for mental health concerns six times since 2014. She testified that she has been struggling with mental health issues for 20 years and is still working with professionals to find a mental health treatment protocol that works for her. Mother admitted that her diagnoses of complex post-traumatic stress disorder, major depressive disorder, and general anxiety disorder have rendered her unable to get out of bed to engage in normal and necessary daily activities on multiple occasions. Mother conceded that those same issues preclude her ability to provide an adequate home for the children at this time.

{¶25} The children have lived for several years in an environment in which they have had to routinely provide daily care for themselves when Mother's mental health impacts her ability to function. W.W. and E.W. deserve the permanence of a stable home where their needs will be met on a consistent basis. Father has been a constant presence in the boys' lives, taking full advantage of his visitation schedule and speaking with the children by phone three times every week. Father's visits with the boys have always been unsupervised and the record does not reflect that there have ever been any concerns regarding his interactions with them.

{¶26} Father has the desire and ability to provide a permanent home for the children. He has worked for General Motors for 23 years and earns $90,000 a year. He transferred from the overnight third shift to the daytime first shift to allow him to be home with the children. He lives

in a very large one-bedroom apartment but has coordinated with his landlord to move into a two-bedroom unit as soon as necessary, i.e., when he has attained legal custody of the children. The guardian ad litem visited Father's current home in Indiana and found it appropriate. She opined that a larger apartment in the same complex would be equally appropriate. Father has investigated options for school, before- and after-school care, and medical/dental providers for the children. He only needed to finalize the boys' enrollments and establishment as patients.

{¶27} Both children have been in treatment for several years for their own mental health issues. W.W. was diagnosed with adjustment disorder with mixed emotional disturbances, anxiety, and oppositional defiant disorder. E.W. was diagnosed with attention deficit hyperactivity disorder. Each child attends biweekly counseling sessions and takes medications to address these issues. The guardian ad litem testified that, since the children's placement with Aunt and Uncle, the professionals working with W.W. have successfully reduced his medication dosage. The effect on the child has been positive, as he now smiles frequently and has become more engaging. Father is working with the caseworker to find appropriate mental health providers near his home to continue the children in counseling. He understands their mental health issues and agrees to ensure that they continue to receive all necessary services, including counseling and medications, as recommended by the professionals. Father recently participated in counseling sessions with each child, and the counselor found his interactions appropriate, as Father listened to the children and remained neutral when the boys expressed their thoughts about custody.

{¶28} Both the caseworker and guardian ad litem agreed that Father was suitable to provide permanency for the children without the need for continuing oversight by the agency or juvenile court. Because Father had an established history of providing for the children's needs and was not involved in the circumstances which necessitated CSB's involvement, both the

caseworker and guardian ad litem testified that ongoing protective supervision was not necessary for the benefit of the children.

{¶29} On the other hand, Mother's mental health issues played a significant role in the agency's intervention. The caseworker emphasized that the instant cases began with a mental health crisis for Mother and that Mother again recently sought hospitalization for another mental health crisis which included suicidal ideations. Mother admitted she was unable to leave her bed, had not eaten or taken her medications for several days, and believed that Father should take the children. Given the chronic nature of Mother's mental health issues despite two decades of therapies, medication management, and various other attempted and anticipated treatments, there was no way to determine how long it might take for Mother to successfully manage her symptoms and be able to provide care and stability for the children. The boys reported multiple instances when Mother was bedridden and unable to provide for their daily care, leaving them to get themselves ready for school and prepare their own meals. Unless and until Mother is able to manage her mental health, the children would continue indefinitely to be at risk for neglect in Mother's home. On the other hand, there was no evidence that Father ever failed to provide for the children's basic needs while in his care.

{¶30} While Father resides outside of Ohio, he has done so for several years. The parents have managed visitation arrangements without difficulty under those circumstances.

{¶31} Finally, Father has a good support network. He maintains a good relationship with Aunt and Uncle, who informed him, the caseworker, and guardian ad litem that they are willing to supervise visitation for Mother. Father also has the support of his mother. The paternal grandmother is retired, has a close relationship with the children, and lives only three hours away

from Father's home. She testified that she is willing and available to travel to Father's home to help with the children whenever needed or requested.

{¶32} Based on a thorough review of the record, this is not the exceptional case where the trier of fact clearly lost its way and created a manifest miscarriage of justice by awarding legal custody of W.W. and E.W. to Father. Father demonstrated by a preponderance of the evidence that it is in the children's best interest to be in his legal custody. Father has played a consistent role in the children's lives, providing stability and support without any concerns for the boys' health, safety, or welfare. The children are comfortable with Father and wish to live with him. CSB and the guardian ad litem support an award of legal custody to Father without ongoing protective supervision.

{¶33} Father has been proactive in preparing for legal custody of the children. He arranged to move into a larger apartment to accommodate the boys. He identified a school, daycare, and medical/dental service providers for the children. He was working with the agency caseworker to find appropriate pediatric mental health providers so the children could continue in counseling. Father modified his work schedule to be home with the children. He has the support of the paternal grandmother who is willing and able to drive to Father's home to help with the children's care, should Father require that.

{¶34} Unfortunately, Mother is admittedly unable to provide an appropriate home for the children at this time. She detailed her ongoing mental health issues and informed the guardian ad litem two months before the hearing that she believed she was "treatment resistant" to mental health care. Mother did not present any evidence regarding how long it might take her to successfully manage her mental health issues, or if she would ever attain the stability necessary to provide consistent care for the children.

{¶35}  Father demonstrated that he is able to provide a safe and stable home for the children as of the date of the hearing.  His history of providing care for the children without any concerns for their well-being vitiated the need for continuing oversight by CSB or the juvenile court.  Under the circumstances, the juvenile court's finding that an award of legal custody to Father is in the children's best interest is not against the manifest weight of the evidence.  Mother's first assignment of error is overruled.

## ASSIGNMENT OF ERROR II

THE [JUVENILE] COURT COMMITTED REVERSIBLE ERROR TO MOTHER'S GREAT DETRIMENT IN DETERMINING THAT AN ICPC SCREENING AND ACCEPTANCE OF THIS CASE WAS NOT REQUIRED PRIOR TO THE TRANSFER OF THE CHILDREN'S CUSTODY FOR THE PURPOSE OF OUT-OF-STATE PLACEMENT.

{¶36}  Mother argues that the juvenile court erred by granting legal custody to Father and closing the children's cases after determining that an ICPC assessment of Father and his circumstances was unnecessary.  This Court disagrees.

{¶37}  Revised Code Section 5103.20 sets forth 18 articles governing the interstate compact for the placement of children ("ICPC").  Article I.(A) lists as one of the purposes of the compact the "[p]rovi[sion] [of] a process through which children subject to this compact are placed in safe and suitable homes in a timely manner."  Article V. addresses the requirement for an assessment of proposed placement in another state.  The ICPC by its plain language is not applicable under certain circumstances.

{¶38}  By definition in the ICPC, a "non-custodial parent" is "a person who, at the time of the commencement of court proceedings in the sending state, does not have sole legal custody of the child or has joint legal custody of a child, and who is not the subject of allegations or findings of child abuse or neglect."  R.C. 5103.20 Article II.(I).  Father qualifies as the children's non-

custodial parent because the children were placed in the parents' joint custody after the 2014 case. Moreover, CSB made no allegations of abuse or neglect as to Father in its 2021 complaints and the juvenile court made no such findings as to Father.

{¶39} Article III. of the ICPC addresses the applicability of the compact and expressly states:

(B) The provisions of this compact shall not apply to:

* * *

(4) The placement of a child with a non-custodial parent provided that:

(a) The non-custodial parent proves to the satisfaction of a court in the sending state a substantial relationship with the child; and

(b) The court in the sending state makes a written finding that placement with the non-custodial parent is in the best interests of the child; and

(c) The court in the sending state dismisses its jurisdiction over the child's case.

{¶40} In this case, the evidence demonstrated and the juvenile court found that Father had a substantial relationship with the children and that it was in their best interest to award legal custody to Father. Thereafter, the juvenile court docketed the cases closed. With the children's custodial dispositions finalized and no further issues pending, the juvenile court properly dismissed its jurisdiction over W.W.'s and E.W.'s cases. As the requirements for exclusion from application of the ICPC were met, the juvenile court did not err by refusing to require CSB to request that Indiana initiate a home study of Father's home before placing the children with him. *Compare In re T.K.M.*, 1st Dist. Hamilton No. C-190020, 2019-Ohio-5076, ¶ 35-36 (rejecting an out-of-state parent's argument that an ICPC assessment that did not approve his home should not be considered because he was excepted from application of the compact after concluding that the parent had not demonstrated the three requirements pursuant to R.C. 5103.20 Article III.(B)). Mother's second assignment of error is overruled.

III.

**{¶41}** Mother's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

_____
JENNIFER HENSAL
FOR THE COURT


CARR, J.
CONCURS.

FLAGG LANZINGER, J.
DISSENTING.

{¶42} I respectfully dissent. I would conclude that the juvenile court's award of legal custody of the children to Father at this early stage of their cases is against the manifest weight of the evidence. Based on that conclusion, I would not address Mother's second assignment as it would be moot.

{¶43} Mother argues that the juvenile court's award of legal custody of W.W. and E.W. to Father, particularly without ordering a period of protective supervision, is contrary to the best interest of the children. In addition, Mother challenges the juvenile court's entering a final dispositional order before it adopted the agency's proposed case plan, leaving Mother no opportunity to work on her case plan objectives. I agree that the juvenile court rushed to judgment in these cases.

{¶44} Prior to their removal in these cases, Mother had been the children's primary caregiver their entire lives. After the parents ended their relationship, the children spent less than half their time with Father during the next two years. After Father left Ohio, W.W. and E.W. visited with him for only five weeks throughout the course of every year. The three were always on vacation during those times, so Father had no responsibility for getting the children to school,

appointments, or other scheduled activities. In addition, Father allowed the boys to spend time with the paternal grandmother during his scheduled visitation periods, limiting further the time they remained in his exclusive care.

{¶45} The evidence demonstrated that W.W. and E.W. were well acclimated to their home environment with Mother. They were both doing extremely well in school where they were engaged in accelerated academic programs. Mother has a three-bedroom home where the boys were able to have their own rooms. The children have long-term friends and various family members in Ohio. They are established with medical, dental, and mental health providers near Mother's home. Consistent participation in mental health services is particularly important for the boys.

{¶46} Both children have been in treatment for several years for mental health issues. W.W. was diagnosed with adjustment disorder with mixed emotional disturbances, anxiety, and oppositional defiant disorder. E.W. was diagnosed with attention deficit hyperactivity disorder. Each child attends biweekly counseling sessions and takes medications to address these issues. Mother was proactive in establishing services for the children, while Father has never had to coordinate with professionals to meet the children's special needs.

{¶47} Mother's home offers an appropriate physical structure for the boys. They were comfortable in that familiar environment. On the other hand, during the past several years, Father established homes out of state, first in Kentucky, and currently in Indiana. The children have not lived with Father for any extended time after he left Ohio. Father does not have a bedroom for the children in his current home, although he testified that he planned to obtain a two-bedroom apartment so the boys could share a room, in the event he obtained legal custody. Outside of Father, the children have no family or friends in Indiana. They are not familiar with the school,

daycare, or medical providers Father has considered. While the paternal grandmother testified that she would be available to help Father care for the children, she lives three hours away. Perhaps most significantly, the children have no relationship with any mental health counselors where Father lives. In fact, Father has not even identified counselors who would be available and qualified to work with the children. While the CSB caseworker testified that she would put Father in contact with his Indiana county's child welfare agency in the hopes that they would identify counseling options for the boys, that had not yet happened.

{¶48} While the majority is confident that the children have settled in their desire to live with Father, I would emphasize that their wishes have fluctuated during the short pendency of these cases. The boys initially expressed the desire to live with Mother, later hedging but still asserting that they would live with Mother "if things were normal[.]" Mother's recent mental health struggles admittedly disrupted the children's "normal" environment.

{¶49} Mother is fully aware of the significance of her mental health issues and that she is prone to bouts of anxiety and depression. She has consistently strived to manage her symptoms, working with professionals for 20 years to adopt and modify treatment protocols and readily seeking in-patient services to address crises. Before admitting herself for in-hospital care, Mother has made arrangements with other adults to provide care for the children. Although she understands that she is currently unable to care for the boys because of a recent mental health crisis, Mother has demonstrated consistent efforts to address her issues. She has further demonstrated sustained periods of stability and the ability to provide an appropriate environment for the children. It does not seem unreasonable to delay finalizing the children's custodial disposition to allow Mother at least some time to work on case plan objectives.

{¶50} I do not believe that the evidence established that there were no concerns regarding Father's ability to provide a safe and stable home for the children. Mother testified that Father was verbally and emotionally abusive toward her when they lived together. In fact, she sought intervention by CSB while pregnant with E.W. and struggling with depression and suicidal thoughts because Father was dismissive and emotionally abusive to her. The caseworker admitted that she remembered such allegations of Father's abuse in the 2014 case. Although the guardian ad litem dismissed the issues of Father's abuse of Mother as having occurred "[m]any years ago," Mother testified that Father was still frequently verbally abusive, and that the children heard him calling her profane names while the parents talked on the phone.

{¶51} Father admitted during the hearing that Mother never interfered with his ability to take the children for visits. On the other hand, after the magistrate awarded him legal custody and Father took the children to his home in Indiana, Mother had to seek court intervention when Father refused her visits with the boys for more than a month. As a result, the magistrate ordered Father to make the children available to Mother for visitation on the first weekend of every month. Accordingly, while Father testified that he would facilitate visits between Mother and the children, his actions after obtaining legal custody demonstrated otherwise.

{¶52} Finally, although CSB and the guardian ad litem supported granting Father's dispositional motion and closing the children's cases, neither the caseworker nor guardian articulated any persuasive reasons to forego at least a limited period of oversight to ensure that the change in custody was in the boys' best interest. The guardian ad litem argued against an ICPC assessment of Father's home and circumstances which might have illuminated issues not yet identified during the short tenure of the cases. She argued only that such assessments can take a long time and would merely prolong the children's cases. Given the limited time the children had

spent with Father during the past three years, Father's lack of experience providing the boys' day-to-day care, his unfinalized move and enrollment of the children in school and services, and the allegations that Father has been verbally and emotionally abusive, I believe that the guardian's presumption that there were no concerns for the children's well-being with Father was unfounded. If nothing else, there was evidence that Father was not inclined to facilitate an ongoing relationship between the children and Mother, despite their established bond.

{¶53} After reviewing the record, I would conclude that this is the exceptional case in which the trier of fact lost its way and committed a manifest miscarriage of justice by awarding legal custody of the children to Father without any period of protective supervision, and instead closing the cases. As Father filed the motion for legal custody, he bore the burden of proving by a preponderance of the evidence that transitioning W.W. and E.W. into his home in Indiana with no ongoing monitoring by CSB, the guardian ad litem, and the juvenile court was in the best interest of the children. *See In re A.W.*, 9th Dist. Lorain No. 20CA011671, 2021-Ohio-2975, ¶ 17. In my opinion, the evidence does not indicate that Father met his burden. Given the very brief time (just over four months) that CSB and the guardian ad litem had to investigate the out-of-state parent who had not had the opportunity to provide care for the boys on an extended basis for several years, I believe that closing the children's cases was premature.

{¶54} All parties recognize the boys' history of mental health treatment and the need to continue with those services. The children also have basic needs like adequate housing, education, daycare, and access to medical and dental care. While Father may ultimately demonstrate his ability to provide a safe and stable home for the boys, the evidence presented in these cases was largely speculative and merely indicated good intentions and high hopes. Father claimed to have identified medical professionals, a daycare provider, and the public school in his district, but he

had not established any services or enrollments. He hoped to move to a two-bedroom apartment under his current lease but he had not finalized those plans. Father had not yet identified any mental health service providers for the boys. The CSB caseworker's plan to contact the child welfare agency in Father's county for counseling references for the children demonstrates the ongoing benefit of agency involvement in these cases.

{¶55} I further cannot ignore the prior history of verbal and emotional abuse between Mother and Father. It was unreasonable for the juvenile court to fault Mother for maintaining a relationship with an abusive boyfriend, while diminishing the significance of Father's abusive treatment of Mother. Moreover, Father spent limited time parenting the children during the past several years, never for an extended period, and always when he and the children were on vacation without the demands of school, appointments, or routines. Father tacitly admitted that he did not pursue additional visitation with the children because it was too much trouble to try to work out an arrangement with Mother. Accordingly, the juvenile court's reliance in part on the finding that Father was the "non-offending party" in these cases was not consistent with the sum and substance of the evidence.

{¶56} As a final note, I am concerned that CSB filed complaints alleging the children's abuse, neglect, and dependency, but immediately after adjudication abdicated its role as a proactive agent for the children's welfare. The agency failed to file a dispositional motion, present a case in chief, or advocate a stance based on a thorough investigation. Instead, CSB offered its support of Father's motion and let Father prosecute the cases initiated by the agency. It is disconcerting that an ICPC assessment, the tool designed to verify the propriety of a placement for children, was portrayed as an inconvenience and too time consuming to utilize. *See* R.C. 5103.23 Art. I, Purpose and Policy (A)-(D). Reasonable investigation, particularly when the propriety of the proposed

placement or custodial disposition is based on mere speculation and the cases are in their earliest stages, is not a waste of time. The well-being of children merits no less.

{¶57} For the reasons enunciated above, I would conclude that Father failed to meet his burden of proof in these cases. The decision to close the children's cases after the initial dispositional hearing and award legal custody to Father without ongoing oversight was premature and based predominantly on mere speculation. Accordingly, I believe that the juvenile court's judgment is against the manifest weight of the evidence. I would sustain Mother's first assignment of error and decline to address her second as moot.

APPEARANCES:

ALEXANDRA HULL, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN R. DIMARTINO, Assistant Prosecuting Attorney, for Appellee.

SHUBHRA AGARWAL, Attorney at Law, for Appellee.

HOLLY FARAH, Guardian ad Litem.